Horton, Appellant, *v.* West Penn Power Company et al.

Argued April 25, 1935.

Before KELLER, P. J., CUN-
NINGHAM, BALDRIGE, STADTFELD, PARKER, JAMES and
RHODES, JJ.

*William A. Challener, Jr.,* with him *William A. Challener,* for appellant.

*Murray J.,* and *Fred J. Jordan,* for appellee.

OPINION BY CUNNINGHAM, J., July 18, 1935:

This appeal by the claimant in a workmen's compensation case had its origin in the dismissal of his petition for the reinstatement of a compensation agreement.

In the course of Horton's employment as a lineman by the defendant company, a pole upon which he was changing wires fell; his injuries consisted of a fracture of the skull and a fractured and infected foot.

The accident occurred April 14, 1930; an open agreement for payment of compensation for total disability at the maximum rate of $15 per week from April 21st was executed by the parties and approved by the board. This agreement was drawn under Section 306 (a) of the Workmen's Compensation Act of June 2, 1915, P. L. 736, as further amended by the Act of April 13, 1927, P. L. 186, and had a potential life of 500 weeks, subject to the limitations of the statute. It was in full operation until August, 1931, during which month claimant's injured foot was amputated. Under date of August 18, 1931, a supplemental agreement, covering the loss of the foot, was executed under Section 306 (c); the latter agreement provided for the payment of $15 per week for the "definite" period of 150 weeks from the seventh day after the accident and superseded the original agreement.

During the period from April 21, 1930, to August 18, 1931, (67 5/7 weeks), claimant was paid, under the original agreement, for 57 3/7 weeks—a total of $861.43—and worked the remaining 10 2/7 weeks. As payments under 306 (c) for the loss of a member are to be made without regard to the existence or extent of disability, we are not concerned in this case with the

periods of time claimant worked, either before or after the execution of the supplemental agreement, or with his earnings during those periods.

We agree with the board and court below that the "definite" period of the supplemental agreement expired March 5, 1933,—150 weeks after the seventh day following the accident: DeJoseph v. Standard Steel Car Co. et al., 99 Pa. Superior Ct. 497; Barlock v. Orient Coal & Coke Co. et al., 114 Pa. Superior Ct. 228, 173 A. 666, (Affirmed by the Supreme Court May 13, 1935, 319 Pa. 119, 178 A. 840). The controversy out of which this appeal arose centers around that date.

By the supplemental agreement it was provided that claimant should receive $2,250 (150 weeks at $15 per week) less the above mentioned $861.43 paid under the original agreement, or a balance of $1,388.57. On March 2, 1933, the employer issued a check for the last payment under the supplemental agreement and tendered a final receipt which claimant declined to sign.

The docket entries of the board indicate that on May 10, 1933, more than two months after the expiration of the 150 weeks' period, a petition was filed on behalf of claimant for the reinstatement of the original compensation agreement, and on June 30, 1933, an amended petition was filed. The petition, as amended, was filed under the second paragraph of Section 413 and requested reinstatement upon these grounds: "1. That my disability has recurred. 2. That on or about June 5, 1932, I suffered an epileptic attack which I am informed and believe and therefore aver was the direct result of the accident which I sustained on April 14, 1930. 3. That said attacks have recurred from time to time, and I am informed and believe and therefore aver that as a result of the accident which I sustained on April 14, 1930, I now suffer a total disability."

In effect, the relief sought by claimant was that he be compensated for a disability which had manifested it-

self in June, 1932, and was separate, distinct and apart from the disability incident to the loss of his foot. See Lente v. Luci, 275 Pa. 217 (p. 221), 119 A. 132; Clark v. Clearfield Opera House Co. et al., 275 Pa. 244, 119 A. 136; Barlock v. Orient Coal & Coke Co., supra.

The employer and its insurance carrier, in addition to averring there had been no change in claimant's disability, pleaded the limitation prescribed by the amendment of 1927, supra, to the second paragraph of Section 413. That limitation, so far as applicable here, reads: "...... An agreement or an award can only be reviewed, modified, or reinstated during the time such agreement or award has to run, *if for a definite period;* ......"

In July, 1933, the matter came on for a hearing before a referee. There was evidence by claimant that he started to drive a truck for the employer in February, 1932; that his first seizure was in June of that year, the second in December and another in February, 1933; that he was given work as a ground man; and that he was discharged on February 28, 1933, "on account of these spells" and advised to file a petition right away.

Several continued hearings were held at which, inter alia, the testimony of medical experts was taken. For present purposes it is not necessary to review their evidence in detail. There was competent and uncontradicted evidence indicating that at the expiration of the 150 weeks' period claimant was a victim of traumatic epilepsy, directly attributable to the skull fracture and brain injury received in his accidental fall on April 14, 1930; that by reason of the development of scar tissue, claimant, at least since February, 1933, has been an "unsafe employee"; that his physical disability was the sole reason for his discharge; that his attacks will probably "return and recur"; and that the disability which existed at the expiration of the supplemental agreement

was entirely separate and distinct from that caused by the amputation of his foot. Briefly, the medical testimony tended to show both a recurrence and an increase in the disability attributable to the head injuries suffered in the accident.

Neither the referee nor board made any specific findings upon these matters, but dismissed claimant's petition solely upon the technical ground that it had been filed too late. The court below, deeming itself bound by certain alleged findings of the board to which we shall refer later, affirmed the action of the board and entered judgment for the defendants.

It is earnestly contended by counsel for claimant, in support of this appeal, that the record discloses facts which, when considered in the light of the purpose and spirit of the statute, should operate to prevent the application of the strict letter of the limitation now invoked by the employer and its insurance carrier.

By way of explanation of the admitted fact that the petition did not reach the principal office of the board until May 10, 1933, these circumstances appear from the evidence submitted in behalf of claimant.

Richard Herman, one of the representatives of the employer, testified that he was instructed by his superior on March 1, 1933, [four days prior to the expiration of the supplemental agreement] that claimant had been "laid off and was supposed to file a petition with the compensation board for rehearing"; and that he saw claimant the same day and was informed by him that Dr. Rogers [the family physician] was not the person to whom application should be made. His testimony continued: "Q. And then, what did you do? How did you find out who was the proper person? A. Well, I called Dr. Rogers and asked him who would be the person to make this application to, and he told me he thought it was Mr. Blanchard; Mr. Blanchard was an attorney for the compensation board, and that Mr.

Blanchard was the one to make this application to. Q. Then, did you call anybody else? A. Yes, first I tried to locate Mr. Blanchard by 'phoning; I couldn't get him at his office. Q. Well, what I am getting at—did you call Judge Dale? [Chairman of the board] A. Yes. Q. And, did you speak to Judge Dale? A. Yes. Q. What did you say to him? ...... A. I asked Mr. Dale who the proper person was to make this application with—with him or with Mr. Blanchard, and he advised to see Mr. Blanchard. Q. You didn't actually speak to Mr. Blanchard, I don't believe. A. No, I didn't see Mr. Blanchard. Q. You merely got a report back from Horton that Horton had seen Mr. Blanchard? A. That's right."

Claimant, after testifying that he was sent to Mr. Blanchard on March 1st and was told by him to return the next morning, proceeded: "Q. You saw Mr. Blanchard on the morning of March 2d? A. Yes, sir. Q. And, what did you tell him? A. Well, I explained my case to him, and asked him to put in a petition for me. Q. Now, when you say you explained your case, did you explain about your condition? A. Yes, said I had been to Pittsburgh to two doctors; had fits; I showed him my leg. Q. And, did he take your name? A. He took my name and address, and told me he would fix it up. Q. Then what did he tell you? A. He told me he would fix it up; that would be all. ...... Q. Did Mr. Blanchard tell you that you would be notified when a hearing would be held? ...... A. I believe he did; yes, he did. ...... Q. Did you see him [Mr. Blanchard] on March 4th? A. I seen him on March 4th. Q. Where did you see him on March 4th? A. Out on the street. Q. Was he on the street or in an automobile? A. Just got in his car. Q. Did you speak to him about your petition? A. Yes, I asked if the petition had been put in, and he said yes. Q. Now, when did you discover that no petition had actually been filed? A. After I

had a letter wrote to Harrisburg to find out about it."

Edmund Blanchard, Esq., after stating he was a member of the bar of Centre County and "a representative of the Workmen's Compensation Board," thus defined his duties: "Q. What is your official title? A. Well, it is assistant attorney, I think. Q. Among your duties do you assist claimants in filing petitions? A. Well, I wouldn't necessarily do it, but if they come and ask me, I do it."

Although Mr. Blanchard's recollection concerning the details of the claimant's visits to his office seems to have become somewhat vague by the time of the hearing, he admitted that on June 17, 1933, he made, and gave to Horton, an affidavit reading: "I ...... do hereby state that George C. Horton, of Bellefonte, Pa., called at my office in person on March 2-1933 and explained his case to me; that is he showed me his foot and also told me that he desired to file a petition to review his agreement in order to show he has a total disability as the result of head injuries sustained in this accident of his on April 14-1930, and I took his name and address and told him everything would be all right but through my neglect the petition was not filed until I believe some time in May of 1933."

Upon this branch of the case, the board, in an opinion by Commissioner Hunter, said: "This employee's duties are not connected in any way with the preparation of petitions for either claimants or defendants, nor is it his function to advise how or when these shall be filed or to receive them on behalf of the board."

As already stated, the court below treated this statement as a finding of fact binding upon it. We are not convinced that it should be given the force and effect of a finding of fact. It, undoubtedly, is an expression of the board's understanding of the scope of Blanchard's employment. If intended as a finding, it is not merely unsupported by any evidence upon this record,

but, indeed, is contrary to Blanchard's own description of the duties which he, in fact, performed for claimants not represented by private counsel. Moreover, the above quoted testimony of Herman indicates that Blanchard undertook the duty of filing the petition with the knowledge, and at the suggestion, of the chairman of the board.

Proceedings under our compensation statute are not litigation in the ordinary sense of that word; it is neither required nor contemplated that claimants shall, in all cases, be represented by private counsel. It seems to us that the fair inference from all the evidence is that Horton, who was then unrepresented by counsel, was misled by those upon whom he reasonably assumed he had a right to rely into the belief and assurance that he had done everything required of him in order to protect his claim to additional compensation. No matter how unintentional Blanchard's failure to file the petition may have been, claimant should not be penalized for relying upon his assurance that "everything would be all right." The situation here is comparable to that discussed in Horn v. Lehigh Valley R. R. Co., 274 Pa. 42, 117 A. 409. As was there stated, (p. 44) where a person is unintentionally deceived by one who has authority to act in the premises, courts will not, if it is possible to prevent it, permit such deception to work an injury to the innocent party. In addition to what we have already said about Blanchard's powers and duties, it should be noted that the parties interested in protecting claimant's rights were referred to him by the chairman of the compensation board. When all the evidence upon this aspect of the case is taken into consideration, we think the conclusion follows that Blanchard had "authority to act in the premises."

If it be suggested that the rights of the insurance carrier are also involved, it may be pointed out that J. E. Fife, a division superintendent for the employer,

testified: "Q. Did you take up the question of Mr. Horton's condition with anybody representing the Pennsylvania Manufacturers' Association? A. Yes. Q. Who was that? A. C. B. Gillis. Q. Who is C. B. Gillis? A. The representative of the Pennsylvania Manufacturers' Casualty Insurance Company, located at Ridgway. Q. Can you fix the date on which you had a conversation with him? A. March 4, 1933. Q. And, what did you tell Mr. Gillis? A. I told him that Mr. Horton had already filed a petition for review. Q. Did you tell him anything about Horton's condition? A. Yes. Q. What did you tell him about that? A. I told him that on reports of Dr. Weil and Dr. Mitchell that Horton—well, in accordance with those reports Horton was no longer safe to work. Q. Did you ever furnish Mr. Gillis with a copy of Dr. Weil's and Dr. Mitchell's report? A. Yes. Q. When did you first discover that no written petition for review was actually on file with the workmen's compensation board? A. About the 20th of May. Q. Did Mr. Gillis ever tell you that no petition for review had been filed? A. The same date that I found out there was no petition filed; that is where I received my information."

It is therefore perfectly clear that the insurance carrier had full knowledge, prior to the expiration of the supplemental agreement, of claimant's disability from his head injuries and of his claim for additional compensation. Neither of the defendants has been misled in even the slightest particular nor deprived of any available defence. The position now assumed by the employer is utterly inconsistent with the acts and declarations of its representatives prior to March 5, 1933. The testimony which we have quoted demonstrates that it was their intention, when arranging for Horton's discharge, to protect his right to have his claim for further compensation adjudicated; they knew his physical condition and that he had refused to sign a final re-

ceipt. Every act and declaration of the officials acting for the employer at that time was calculated to, and obviously did, lead Horton to believe that the petition would be filed before the fifth of March. We do not intimate that they intended to mislead him to his prejudice; on the contrary, their actions at that time were most commendable. It is difficult, however, to reconcile the defendants' attitude at the hearing with their position prior to the expiration of the supplemental agreement.

The provision of the amendment of 1927 here involved is mandatory and no court has authority to modify it. It does not follow, however, that the running of this statute of limitation may not be tolled by the declarations and conduct of the parties invoking its protection. Upon consideration of the particular and unusual facts disclosed by this record, and having in mind the humanitarian purposes of the statute, we are of opinion that the conduct of the defendants, during the running of the period of limitation, constitutes such a quasi-estoppel as to prevent them from now setting up the bar of the limitation upon which they rely.

This record must, therefore, be remitted to the board, through the court below, with instructions to reinstate the claimant's petition and consider and dispose of the merits of the issues raised by it and the defendants' answer, upon the testimony already upon the record and such additional competent evidence as either or both sides may see fit to offer.

Judgment reversed and record remitted for further proceedings not inconsistent with this opinion.