Opinion by
 

 Rhodes, J.,
 

 This is an appeal by complainants from an order of the Pennsylvania Public Utility Commission which was to the effect that it was unlawful for the Latrobe Water Company to continue to serve unfiltered water to the public, including complainants, and that it was unreasonable to require the company to serve filtered water to complainants and certain others who indicated their desire for water service. The commission dismissed the complaint.
 

 The Borough of Latrobe, in Westmoreland County, lies between Derry Township on the east and southeast, and Unity Township on the north, west, and southwest. Approximately five miles to the southeast, and, at that point, adjacent to both Unity and Derry Townships, lies Ligonier Township.
 

 The Latrobe Water Company was chartered November 13,1883, “for the purpose of supplying water to the public at the Borough of Latrobe in Westmoreland County and to persons, partnerships, and associations residing therein and adjacent thereto as may desire the same.” On June 26, 1884, the Derry Township Water
 
 *259
 
 Company was chartered for the purpose of supplying water to the public in Derry Township, and on April 8, 1885, the two companies merged. In July, 1906, under the authority of the Act of May 21, 1901, P. L. 270, the Latrobe Water Company extended its service territory to include the community of North Latrobe, situated in the portion of Unity Township immediately north of the Borough of Latrobe.
 

 Previous to 1920, the company drew its supply from the waters of Loyalhanna Creek, which flows northwest through the entire area. For this purpose it operated a pumping station at Kingston, on the north bank of the creek in Derry Township, by which water was pumped a distance of three thousand feet to a filtration and chlorination plant, and thence distributed through the service mains of Latrobe, North Latrobe, and the part of Derry Township served by the company. In 1920, it constructed a large storage reservoir on Trout Eun, in Ligonier Township, eight miles, more or less, from Latrobe, and more than five miles from the pumping station. A transmission main or pipe was constructed to carry the water from the reservoir to the pumping station, where it passed into the line to the filtration plant and on to the consuming communities.
 

 When this reservoir was constructed, the company received from the Department of Health of the Commonwealth a waterworks permit, signed by the Commissioner of Health, approving the reservoir as a source of supply on certain express conditions, as follows:
 

 “Second: The approval of Trout Bun as a source of public water supply is given with the distinct understanding that all water therefrom served to the public must be subjected to filtration and chlorination. The intake on Loyalhanna Creek may be maintained so as to provide an auxiliary supply but its use is subject to conditions set forth in a prior permit approving said supply.
 

 “Third: Within thirty days of the date of this per
 
 *260
 
 mit, the company shall submit to the State Department of Health for approval, plans of scheme for serving filtered water to all consumers between the dam on Trout Run and the filtration plant.”
 

 The Department of Health was advised on December 1, 1920, in a letter on the company’s letterhead, signed by one J. J. Grace, and sent from Scranton, that all consumption of the unfiltered or “raw” water along the transmission line had been cut off as a satisfaction of the above conditions of the permit.
 

 The record shows that this was not the fact. Long before 1920 there had been connections along the line from the pumping station to the filtration plant, and after construction of the main from the reservoir others were made until in 1936 there was a total of forty-one connections along the entire line by which a total of eighty-eight consumers were served with unfiltered water. Although there was some testimony that the existence of some of these connections was at one time known to a director of the company and its secretary-treasurer, the larger number of them appeared to have been made unon the order of J. J. Walker, the superintendent of the company, given orally to one or another of the company’s employees. The irregularity of this practice seems to have been clearly established. These were the only service orders not issued on the printed forms used for connections in Latrobe or the other communities served; some of these consumers paid nothing for the service; others were charged a flat rate of $10 per year, for which no statement was ever rendered but which was collected in cash by Walker or various employees of the company, who turned the collections over to Walker; on Walker’s instructions, no receipts were' ever given for these payments; and if payment was refused service was continued nevertheless. No record of these payments was made on the books of the company, and this raw water consumption appeared on the records of the company only in the statements issued
 
 *261
 
 the Ligonier Valley Railroad Company, including the supply to the Kingston station. The only other writing ever shown to have passed through the company office with relation to these connections was a check for $10 sent by one consumer on an occasion when the employee sent to collect by Walker found him away from home.
 

 Walker left the employ of the company on July 1, 1936, and C. C. Wedemeyer, who as resident manager succeeded him on that day, having discovered the consumption of raw water, revealed the practice to the district engineer for the Department of Health. The department insisted that its permit be complied with. The company was unwilling to erect a supply line leading back toward the reservoir from its filtration plant, and the controversy was thereupon brought before the commission on a complaint by the consumers of the raw water asking that the company be ordered to continue service to them.
 

 Of the eighty-eight consumers of raw water, fourteen lived in Derry Township, twenty in Unity Township, and fifty-four in Ligonier Township. More particularly, they were distributed in the area on both sides of the pumping station and in that immediately below the reservoir, with an intervening stretch of several miles marked by only one consumer. There was testimony that wells driven in the areas of consumption were highly unsatisfactory, but there was also an expression of opinion by the engineer for the Department of Health that a tributary of Loyalhanna Creek could, with purification, be acceptably developed as a substituted source of supply. The engineer for the company testified that, in his opinion, to furnish these areas with reasonable service from the company’s filtration plant would require the construction of a line 30,370 feet long of eight-inch cement-lined cast-iron pipe, at a total cost of $89,800, exclusive of rights of way, maintenance, or service connections. He admitted
 
 *262
 
 the feasibility of a small chlorinating and filtrating plant for the area near the reservoir, but pointed out that the saving of construction cost in the adoption of this type of facility would be counterbalanced by the cost of employment of personnel to operate it. The testimony on behalf of complainants on this point was limited to an estimate of the purchase price of such a plant and the practicability of a smaller than eight-inch line to serve the area of consumption adjacent to the pumping station. In addition to the eighty-eight known consumers of the raw water, the complainants offered evidence of forty-four other persons willing to use a service provided by the company in these areas, of whom three were in Derry Township and forty-one in Ligonier Township.
 

 There was much testimony that the unfiltered water of the reservoir was unsafe for human consumption and its consumption dangerous to public health. The Department of Health has not varied the conditions of its 1920 permit for use of the Trout Run reservoir, and the commission was therefore unable, under the law, to order a continuance of the service of unfiltered water. It concluded that to order the furnishing of filtered water to the complainants would be unreasonable in view of the cost. In this connection the commission said in its report: “The unrefuted evidence is that the necessary facilities to furnish filtered and chlorinated water to complainants from respondent’s existing filtered water reservoir would cost in excess of $90,000, which would be more than $680 average cost, per consumer to be thus served, of the necessary additional facilities. This alone and disregarding additional resulting annual operating expenses, the amount of which the record does not disclose, is sufficient evidence that the cost of service to be thus furnished would not be reasonable; and there is nothing in the record to even indicate that there might be a more
 
 *263
 
 advantageous means by which respondent could lawfully furnish service to complainants.”
 

 The commission expressly refrained from making any finding as to the company’s obligation under its charter to furnish water service in Unity and Ligonier Townships.
 

 The controlling question before us is whether there is substantial evidence
 
 [1]
 
 with rational probative force in the record to sustain the findings of fact and the order of the commission.
 
 Modern Transfer Co., Inc., v. Pennsylvania Public Utility Commission et al.,
 
 139 Pa. Superior Ct. 197, 207, 12 A. 2d 458. The question before the commission was largely an administrative one which must be left to the sound judgment and discretion of the commission, and its decision if based upon such substantial evidence will not be disturbed by this court unless it is so capricious, arbitrary, or unreasonable as to amount to error of law or a violation of constitutional rights.
 
 John Benkart & Sons Co. v. Pennsylvania Public Utility Commission,
 
 137 Pa. Superior Ct. 13, 17, 7 A. 2d 588;
 
 Consolidated Edison Co. et al. v. National Labor Relations Board,
 
 59 S. Ct. 206, 305 U.S. 197, 229, 83 L. Ed. 126, 140. We have frequently stated that this court is not a second administrative body, and that we have no power to substitute our judgment for that of the commission in the decision of such matters, and reverse the determination of the commission unless the order is capricious, arbitrary, or unreasonable, an error of law or a violation of constitutional rights.
 
 Sherman et al. v. Public Service Commission et al.,
 
 90 Pa. Superior Ct. 523, 526;
 
 Philadelphia Rural Transit Co. v. Public Service Commission,
 
 103 Pa. Superior Ct. 256, 260, 158 A. 589. It is also provided in section 1107, art. 11, of the Public Utility Law of May 28,
 
 *264
 
 1937, P. L. 1053, 66 PS §1437, as follows: “The order of the commission shall not be vacated or set aside, either in whole or in part, except for error of law or lack of evidence to support the finding, determination, or order of the commission, or violation of constitutional rights.” It cannot be said of the evidence in the present case, which we have above summarized, that there was any lack of substantial evidence to support the findings and order of the commission, or that its refusal to order the company to furnish the service requested was unreasonable or a flagrant abuse of discretion. See
 
 Sherman et al. v. Public Service Commission et al.,
 
 supra. There is no suggestion that the order is in violation of any constitutional rights of complainants.
 

 The commission expressly omitted any finding as to the company’s rights and obligations generally to furnish water service in Unity and Ligonier Townships, and it is unnecessary for us to decide the question whether in any event the service so sought could have been required of the company. But it may be said that the undisputed testimony definitely placed Unity and Ligonier Townships beyond the company’s charter area
 
 (Bly v. White Deer Mountain Water Co.,
 
 197 Pa. 80, 46 A. 929;
 
 Johnstown Water Co. v. Public Service Commission et al.,
 
 107 Pa. Superior Ct. 540, 543, 164 A. 101) ; and section 1 of the Act of May 21, 1901, P. L. 270, 15 PS §1407, is not applicable.
 

 And the assumption by merger of the Derry Township Water Company’s power to supply water in Derry Township did not impose upon the company the obligation of supplying service throughout that township.
 
 Wyoming Valley Water Supply Co. v. Public Service Commission,
 
 104 Pa. Superior Ct. 432, 159 A. 340.
 

 The words “adjacent thereto” in the company’s charter are not capable of being construed, as appellants argue, to embrace the distant territory in which complainants reside outside the Borough of Latrobe.
 

 
 *265
 
 In
 
 Citizens Electric Illuminating Co. v. Lackawanna & Wyoming Valley Power Co.,
 
 255 Pa. 145, 99 A. 462, a bill in equity was filed to restrain the defendant, chartered for Scranton and adjacent territory, from selling power to the Jenkins Electric Company, chartered for Jenkins Township, eleven miles away, with four boroughs and two townships intervening. The plaintiff was also chartered to and actually did supply Jenkins Township. The injunction was granted, and on appeal this was affirmed on the ground that the language of the Act of April 29, 1874, P. L. 73 [which had been amended by the Act of May 16, 1889, P. L. 226, No. 232, 15 PS §1403], clearly and expressly limits the authority of a water company, and by analogy a power company, to the municipal or quasi municipal division in which it is located.
 

 In
 
 Johnstown Water Co. v. Public Service Commission et al.,
 
 supra, and in
 
 Croyle v. Johnstown Water Co.,
 
 259 Pa. 484, 103 A. 303, the term “vicinity” was held to include territory which could be served as an incident to the main purpose of the utility, that is, supplying water in the City of Johnstown. In the present case, however, it could scarcely be said that the service requested was incidental to that afforded the Borough of Latrobe.
 

 The order of the commission is affirmed, at the cost of complainants.
 

 [1]
 

 See “Substantial Evidence” in Administrative Law, by E. Blythe Stason, 89 University of Pennsylvania Law Beview 1026 (June, 1941).