United Natural Gas Company, (Appellant, *v.* Pennsylvania Public Utility Commission.

Argued April 22, 1943. Before KELLER, P. J., BALD-
RIGE, STADTFELD, RHODES, HIRT, KENWORTHEY and
RENO, JJ.

*W. Pitt Gifford,* with him *Frank J. Woods* and *J. V.
Frampton,* for appellant.

*Samuel Graff Miller,* with him *Harry M. Showalter,*
for appellee.

OPINION BY KELLER, P. J., September 9, 1943:

This appeal is concerned (1) with the interpretation
of a regulation contained in Circular No. 9-A of the
Public Service Commission—the predecessor of the pres-
ent Public Utility Commission—relative to the gas pres-
sure to be maintained by a natural gas company at its

consumer's meter outlet; and (2) whether under that regulation—or otherwise—the Commission may reasonably order a natural gas company to furnish and install, at its own expense, the regulator equipment necessary to furnish natural gas service from a high-pressure transmission main to a rural consumer, whose property is not located along a low-pressure distribution line, and therefore requires the installation of a separate regulator to reduce the pressure so as to be safe for household use.

The complainants in this case, Mr. and Mrs. Parrett, reside and are the owners of property in Bradford Township, McKean County, two and three-quarters miles west of the City of Bradford, on the 'West Branch Road' leading from Bradford to Corydon. The respondent (appellant) is a natural gas company operating and doing business in the City of Bradford.

For some time prior to 1941 the Parretts, along with some forty other persons located along said highway, had been receiving natural gas service from a high-pressure transmission line, operated by one Melhuish, who was *producing* some gas west of Bradford. The service was inadequate and unsatisfactory and failed to furnish gas to the consumers when and as needed. Accordingly Melhuish applied to the Public Utility Commission for leave to discontinue the service and at the same time have the United Natural Gas Company, this appellant (hereinafter called United) begin the furnishing of natural gas service, from a high-pressure transmission line, to his customers, many of whom, including the Parretts, joined in asking the Commission to approve the application. See Nos. A. 59930 and A. 59931.

In their petition, these consumers set forth that they were willing to be supplied by United *under its usual conditions;* and in that connection, they all, including the Parretts, signed written applications to United, asking it to supply them with natural gas from its high-pressure main, and agreed to pay for the furnishing,

laying and installation of all regulators and appliances necessary for the service, including pipes, fittings, valves, etc., the estimated cost to each customer not to exceed $50, $20 of which was paid on account.

A distinction must be made between high-pressure *transmission* mains used to transport natural gas, under pressures ranging from 50 to 75 pounds per square inch up to 300 pounds; medium-pressure lines, carrying pressures of 15 to 25 pounds per square inch; and low-pressure *distribution* lines which carry gas with a pressure of about four to eight *ounces* per square inch, for use by consumers. To reduce the high pressure to a pressure adapted and safe for household consumption regulators must be used; and where an individual consumer located along a transmission main, but not along a distribution line, seeks gas service by tapping the transmission main, a regulator must be installed and "housed" to supply him with safe gas service. In fact, several regulators might be required if the pressure in the transmission main was above 75 pounds—e. g., if the pressure was 300 pounds, one regulator would step down the pressure to 150 pounds; another from 150 pounds to 75 pounds, and a third, from 75 pounds to four ounces, in order to furnish safe gas service to an individual consumer. It was the settled practice of natural gas companies—without objection by the Public Service Commission—to require the consumer, so located, to pay the cost of the necessary regulator and its installation.

In the transmission main used in this case only one step-down process was necessary, but a separate regulator had to be installed and housed for each individual customer's service line.

In order to furnish the desired gas service promptly, the change from Melhuish to United had to be made in midwinter and under difficult weather conditions—for Melhuish's equipment was in bad shape. The bill sent to the Parretts amounted to $45.07, of which $18.60

was for labor. They filed a complaint with the Public Utility Commission, alleging that *the charge was too high*.

At the hearing, held pursuant to said complaint, the only item of the bill that was objected to by complainants was the charge for labor. The regulator *owned and used by the Parretts* on the old line was not in good working order, and while the cost of a new one was $22, the company accepted the old regulator plus a charge of $5—that is, it allowed complainants $17 on their old regulator. Mr. Parrett testified with reference to the bill, "There is a labor charge of eighteen dollars and something [$18.60, itemized]; I will admit the meters are very reasonable [there was no charge for the meter], and the fittings, and such as that, because we handle those ourselves; and the regulator, that was very satisfactory" (p. 61a).

The testimony introduced by United should have satisfied the Commission as to the correctness of the labor charge; it was not rebutted by any definite evidence. To accommodate the consumers, the work was done in midwinter, when the ground was frozen, and the excavation was very hard, through a generally rocky formation. The regulator had to be 'housed', to keep it from deteriorating, and the reasonableness of the charge for this housing, $12, was not questioned.

The commission itself introduced no testimony, and did not suggest at the hearing that Circular No. 9-A, hereinafter referred to, applied to the case, nor did it question the validity or legality of the contracts made, before the installations, by United with its new customers, by which they (the customers) agreed to pay for the furnishing, laying and installation of the necessary regulator equipment.

Without any notice to the respondent of its intention to rule the case on a matter not alleged in the complaint, or raised at the hearing, the Commission, on February 10, 1942, handed down its report (1) sustain-

ing the complaint, on the ground that Circular No. 9-A of the Public Service Commission, promulgated in 1914, applied and required the respondent to furnish and install at its expense all regulating equipment necessary to render service, regardless of the location of its pipelines; and ordering the respondent (2) to cease and desist from charging an applicant for service, or a consumer, for the installation of regulating equipment; and (3) *henceforth* to furnish and install at its expense all regulating equipment necessary to render service as required in Circular No. 9-A.

Although the order was filed on February 10, it was not served on respondent until February 18. Following the neglect of the secretary of the Commission to reply to a letter dispatched promptly by United's counsel, asking him for a complete copy of the transcript of the hearing, respondent's counsel, after waiting eight days for an answer, called the Commission's office by telephone and was told that the transcript could be obtained from a named stenographer of the Commission at Erie. On the same day a request was made by said counsel at that stenographer's office, by telephone. Owing to the absence of the stenographer, no reply was received until the next day, when counsel was advised it was necessary to order the transcript from a Mr. Schmidt at Kittanning. The transcript was ordered the same day but was not received until Saturday, March 7th, seventeen days after the order was served on respondent. On the following Thursday, March 12, respondent filed its petition with the Commission asking for a rehearing and reconsideration nunc pro tunc [1]

---

[1] The *fifteen* days after service of the order, within which a petition for rehearing must be filed (sec. 1006) had expired before respondent received a transcript of the testimony. Had the secretary promptly replied to respondent's letter, refusing the request but *correctly* informing it where the transcript could be obtained, the petition for rehearing would, no doubt, have been filed in time. It was filed *five* days after the transcript was received.

on the ground that the case had been decided on a matter not raised at the hearing, of which no prior notice had been given it, and hence no opportunity had been afforded it to reply to it or to present such evidence as it deemed relevant and necessary for its proper determination.

In view of the circumstances the Commission, before deciding the case on a point not included in the complaint or raised at the hearing, might properly have ordered a rehearing of its own motion. See *Pearl Assurance Corp. v. National Ins. Agency*, 150 Pa. Superior Ct. 265, 274, 28 A. 2d 334, 338. However, the Commission, the Chairman dissenting, refused a rehearing. A copy of this order was served on respondent on March 19, 1942.

On March 18, 1942—within the statutory period of thirty days after *service* (sec. 1101), United appealed from the original order, to No. 12 April Term, 1943. And on April 9, 1942, it appealed from the order refusing a rehearing, to No. 30 April Term, 1943.

The two appeals were argued together.

Circular No. 9-A referred to in the Commission's order, which contains "Rules and Regulations pertaining to Gas Service Utilities" was promulgated by the Public Service Commission on April 9, 1914. While it was amended on December 13, 1920, the portion applied by the present Commission remained unchanged. It reads as follows:

"II.   Pressure Variation:

---

The suggestion of the majority of the Commission in its order, denying a rehearing, filed March 16, 1942, "that respondent had the privilege of applying to the official stenographers at the hearing *for copies of the transcript at the hearing held November 20, 1941*", overlooks the fact that no testimony was adduced at that hearing which supported the complaint or would lead respondent to think that it would be sustained on a ground not broached or referred to at the hearing. The incurring of needless expense by a public utility, at the expense of the consuming public, should not be encouraged.

"Each utility furnishing manufactured gas shall maintain at the consumer's meter outlet a gas pressure of not less than one and one-half inches nor more than eight inches of water pressure; and within said limits the daily variation of pressure at the outlet of any one meter on the system shall never be greater than one hundred (100%) per cent, of the minimum pressure. Each utility furnishing natural gas shall maintain at the consumer's meter outlet a gas pressure of not less than one and one-half inches nor more than fourteen inches of water pressure except when greater pressure is specifically provided in the contract between the utility and the consumer, provided there shall be no unfair and unreasonable discrimination or preference; and within the said limits the daily variation of pressure at the outlet of any one meter on the system shall never exceed four inches of water pressure above or below the normal pressure maintained at such point of delivery unless it can be shown to the Commission that such greater variation is due to extraordinary demand in extreme weather ......".

The following matters should be noted:

(1) The regulations were adopted and promulgated twenty-five years before a majority of the present Public Utility Commission were appointed, and twenty-two years before any member of the present Commission was named a public service commissioner or public utility commissioner. Hence we are just as able to interpret its meaning as they are. In fact, the present Commission seems to have had no knowledge of the existence of the regulation until this case came before it, for its order, here appealed from, marks a departure from the prior settled practice of natural gas companies and the Public Service Commission. Rules and regulations of natural gas companies providing that consumers seeking to obtain gas from high-pressure *transmission* lines must pay for the necessary regulators and the cost of installing them, have been filed and in

force for many years without question by the Public Service Commission, or the Public Utility Commission. See *Fayette Gas Co. v. P. U. Comm.*, 153 Pa. Superior Ct. 271, 33 A. 2d 761.

(2) The regulations cover manufactured gas as well as natural gas. As pointed out in *Penna. P. & L. Co. v. P. S. Comm.*, 128 Pa. Superior Ct. 195, 193 A. 427, there are essential differences in the methods of their distribution and supply. "Natural gas must be transported considerable distances from the wells to points of consumption, which is not true of manufactured gas. The means and facilities employed in securing a supply are different with each." Ibid, pp. 205-6. The economical and usually adopted method of transporting natural gas is by high-pressure transmission mains, while manufactured gas generally uses medium or low pressure lines. The high pressure obviates the use of pipes of large diameter.[2]

(3) A pressure of one ounce per square inch is approximately the same as 1.7 inches of water pressure. A pressure of 4 ounces per square inch—as used in United's distribution lines—is the equivalent of 6.8 inches water pressure; and accordingly $1\frac{1}{2}$ inches of water pressure would approximate a pressure of 88/100 of an ounce per square inch; 8 inches of water pressure would be a pressure of 4.7 ounces per square inch; 14 inches of water pressure would be 8.2 ounces per square inch; and 4 inches of water pressure would be 2.35 ounces per square inch.

(4) The consumer's meter outlet means the point where the consumer receives the gas after it passes through the meter.

---

[2] See *Penna. P. & L. Co. v. P. S. Comm.*, 128 Pa. Superior Ct. 195, 193 A. 427, where this Court upheld the Public Service Commission in refusing to allow the cost of construction of a 14-inch transmission main as part of the rate base, because not provident or prudent—holding that a 10-inch pipe would have been ample (p.208).

(5) This particular regulation is clearly a *safety* measure, and obviously deals with a distribution system. It provides that the pressure of natural gas, when received by the consumer, shall not be *less* than 88/100 of an ounce per square inch, nor more than 8.2 ounces per square inch. In our opinion, it does not contemplate the supply of gas to a consumer directly from a high-pressure transmission line; nor does it contain any provision as to who is to pay for the additional equipment required by that unusual form of service. Circular No. 9-A does not deal with rates or allocation of expenses. Seventeen out of its nineteen paragraphs are concerned with service and inspection tests, records and reports, largely related to the safety element. Paragraph XV relating to Pressure Surveys, which directs the utility to "make frequent measurements of the gas pressure and pressure variation throughout its system," and keep a record of the same, clearly relates to the *distribution system,* so as to assure the consumer a safe pressure, not less than the minimum nor more than the maximum. The Commission could not, under this rule, regulate the pressure to be *used by the company in high-pressure transmission mains.* The only provision as to costs or charges relates to the fees to be charged by the utility for testing meters upon written complaint of consumers. The regulation contemplates the usual method of supplying gas from a high-pressure transmission main, either directly, or through a medium-pressure line, to a low-pressure distribution line, and from thence to the consumer; and this is in accord with the best, safest and most economical method of distribution. It was the practice of the Public Service Commission to treat transmission lines of natural gas companies on a different basis than distribution lines—the one including the procuring and transportation of gas up to the main gate of the distribution system, and the other the distribution system proper. See *Penna. P. & L. v. P. S. Comm.,* supra, p. 204.

The regulation makes no reference to the cost of the regulator equipment necessary to step down the gas from the transmission main to the distribution line, for that is properly assumed to be part of the distribution system, which is installed and paid for by the utility.

But this assumption cannot be made as respects the comparatively uncommon and unusual cases in which, because of their great distance from a low-pressure distribution line, the consumers ask for a connection with the high-pressure transmission main. Safety, which is the prime reason for the regulation, calls for a reduction of the pressure to that used in the low-pressure distribution line; but as the rule or regulation did not contemplate such a course, we cannot assume, as the Commission did, that the cost of the necessary equipment in such case should be imposed on the utility, that is, on the consuming public, rather than on the individual consumer, who alone derives benefit from it. The practice of tapping transmission mains to supply the individual consumer is not to be encouraged. It is an exception, to be resorted to in unusual cases, and it should not be promoted and stimulated, so as to take the place of or supersede regular low-pressure distribution lines.

It must be borne in mind that the fact that a company is authorized to supply natural gas in a certain township does not impose on it the duty to supply gas to every individual in the township who applies for it; any more than the duty rests on a water company. See *Wyoming Valley Water Co. v. P. S. Comm.,* 104 Pa. Superior Ct. 432, 159 A. 340; *Cole v. P. U. Comm.,* 146 Pa. Superior Ct. 257, 264, 22 A. 2d 121. The Natural Gas Company Act of May 29, 1885, P. L. 29, recognizes this, when it provides that corporations may be formed "for the purpose of producing, dealing in, transporting, storing and supplying natural gas to such persons, corporations or associations, *within convenient connecting distance of its line of pipe,* as may desire to use the

same, *upon such terms and under such reasonable regulations as the gas company shall establish.*[3] When that act was passed the distinction between a transmission main and a distribution line was probably not so important, but as gas is now transported for hundreds of miles before it reaches its farthest distribution line it is a vital circumstance.

The case of *L. W. Mathias v. Penna. Gas Co.*, 6 Penna. P.S.C. Reps. 530, much relied on by the Commission in disposing of this case and the one immediately following, the *Fayette Gas Company* case, furnishes no warrant for its action; for when that case reached this Court in *Penna. Gas Co. v. P. S. Comm.*, 83 Pa. Superior Ct. 557, we reversed the Commission; the main ground for our doing so was our ruling that the Commission did not have the power to require a gas company whose supply was insufficient for present domestic use to extend its lines into additional or annexed territory, even for domestic use, unless a sufficient quantity of gas was reasonably obtainable. We said: "Such an order requires the expenditure of the company's capital without the hope of an adequate return and amounts to confiscation; it is unreasonable and not in conformity with law" (p. 566). Hence orders of the Commission relative to the furnishing of gas to applicants outside the *distribution system* of the company must be reasonable, and based on the benefit to the consuming public, not merely on the benefit to the individual applicant. There may be discrimination between classes of consumers, provided it is not unreasonable and rests on a sound

---

[3] The Public Utility Law of 1937 (sec. 401) recognizes the right of the utility to adopt "reasonable rules and regulations governing the conditions under which it shall be *required* to render service." The Public Service Company Law of 1913 (Art. III, sec. 1(c)) also recognized the right of a public service company to have reasonable rules and regulations governing the conduct of its business and the conditions under which it should be required to render service.

basis of fact (*Penna. Gas Co. v. P. S. Comm.*, supra; *Penna. R. R. Co. v. Penna. P. U. Comm.*, 135 Pa. Superior Ct. 5, 4 A. 2d 622; *Carpenter v. Penna. P. U. Comm.*, 141 Pa. Superior Ct. 447, 15 A. 2d 473); and unprofitable extensions of facilities and service at the cost of the utility or consuming public, ordered by the Commission have been reversed. See *Boro of Clarks Summit v. P. S. Comm.*, 92 Pa. Superior Ct. 591; *Overlook Development Co. v. P. S. Comm.*, 101 Pa. Superior Ct. 217; *Citizens Mut. T. & T. Co. v. P. S. Comm.*, 93 Pa. Superior Ct. 373; *Morris Water Co. v. P. S. Comm.*, 118 Pa. Superior Ct. 416, 180 A. 72; *Wyoming Valley Water Co. v. P. S. Comm.*, supra; *Johnstown Water Co. v. P. S. Comm.*, 107 Pa. Superior Ct. 540, 164 A. 101.

In our opinion there is nothing in the regulation above quoted from Circular No. 9-A, that imposes on the utility, in the circumstances above recited, the cost of furnishing and installing the necessary regulator equipment; or that justified the Commission in ignoring and setting aside the contracts between. United and the complainants and the other consumers along the West Branch Road, which were entered into prior to the installation of this service, pursuant to their applications to the company and their petition to the Commission asking it to approve the supplying of gas to them by United "under its usual *conditions*"; which contracts specifically provided that the applicant for service. should pay the cost of the regulator equipment and its installation.

Nor, in our opinion, is it a reasonable requirement that, in the circumstances here present, the utility should be ordered to cease and desist from charging an applicant for service, or a consumer, for the installation of the necessary regulating equipment, regardless of the location of its pipe lines, or be ordered, henceforth in like circumstances, to furnish and install at its expense all regulating equipment necessary to render service to a customer from a high-pressure transmis-

sion main, when by reason of his distance from its distribution system he is unable to be served by its low-pressure distribution lines.

Such an order, as we view it, imposes on the utility and the consuming public an unreasonable expense in that the cost so imposed is not of general benefit but only for the individual benefit of the single consumer, who should himself pay for it.

In its original order of February 10, 1942 the Commission based its action solely on the above cited regulation contained in Circular No. 9-A, adopted April 9, 1914, which, as we have ruled above, does not justify the Commission's action.

In the report and order of March 16, 1942, refusing appellant's petition for a rehearing, the opinion filed by the majority of the Commission went outside the record and introduced figures not offered in evidence or properly made a part of the record. In answer to appellant's averment that compliance with the Commission's order would entail a very much greater expense to serve customers along the transmission lines where pressure reduction is necessary, and would result in discrimination against domestic consumers upon low-pressure distribution lines, the report said: "Nothing, however, is said about the consumers on high-pressure lines who pay the same rates for service as do other consumers on the low-pressure lines, or the large additional capital investment necessary to transmit the gas to such low-pressure areas, plus the additional investment, exclusive of meters, in the distribution system of upwards of $3,762,000 to distribute gas to approximately 56,000 consumers, or an average investment in distribution facilities of $67 per consumer, to which should be added part of the investment in the transmission system of upwards of $6,500,000."

None of these figures appear in this record and we are not informed from what source the Commission obtained them. No opportunity was afforded appellant to dis-

pute or discuss them or show their inapplicability to the question involved. But assuming they are correct, they furnish no valid support to the Commission's order.

A low-pressure distribution system is an absolute necessity to the safe, economical and successful operation of a natural gas company. Without the thousands of consumers supplied by appellant's distribution lines, the company would not be able to do business profitably, and the transmission mains used to supply the consumers located at a distance from the distribution line could not be operated, and these consumers could not be served. A low-pressure distribution line is for the common benefit of all consumers. Once installed, attachments can be made at slight expense as additional customers are secured. The greater the number of customers, the less the investment per individual consumer. All consumers share in the benefits received from the investment in the distribution system. On the other hand, no one is benefited by the installation of the regulator necessary for the safe delivery of natural gas to a consumer from a *transmission main* but the individual served; and the greater the number of such consumers the greater the expense involved under the Commission's order. Consumers generally would have their costs increased by appliances beneficial only to an individual consumer located away from the distribution system, and if he discontinued its use the money thus spent would be thrown away. The specious reasoning of the Commission majority, if applied to water and gas companies generally, would discriminate between the consumers in a city near the source of supply and those located farther away and would have rates of service in a town or city vary with the distance from the reservoir or source of supply. Costs which are for the benefit of the consumers generally—that is, the consuming public, should be included in the capital investment used as a common rate base and be applied to all; but

when a customer, so far distant from a distribution line as to make it impracticable for him to be served thereby, asks for a special and unusual service, necessitating the installation of equipment of no benefit to anyone but the individual consumer, and which cannot be used for general distribution purposes, the cost of the equipment should be borne by the consumer and not by the utility or the consuming public.

There is no similarity between natural gas companies and electric light and power companies in this respect.

Natural gas is transported great distances in high-pressure transmission mains, and delivered to low-pressure distribution lines for safe use by the individual consumer. The cost of installing the regulator necessary to step down the pressure from the transmission main to the distribution line, being for the common benefit, is paid by the utility and forms part of its capital investment. Being contained in pipes there is no loss of gas to speak of, if the pipes, transmission and distribution, are properly constructed and kept in good condition.

Electricity is conducted by wires. To conduct it economically for great distances (as is now generally the case) a very high voltage current must be used; otherwise the loss of current is so great as to make its transmission for great distances impracticable, if not impossible. Hence in introducing electricity into a home or building, a transformer is used to reduce the high voltage current in the *distribution* line to one safe for household use. The cost of the transformer is naturally borne by the utility. Were it equally practicable to have a low current *distribution line* of electricity, from which current could be furnished a consumer for household use, the situation would be different. It has been found more practicable and less expensive to the company to use a high voltage distribution line with individual transformers than a low volt-

age distribution line without them. This justifies the difference of treatment accorded them.

The results of the Commission's order is well set forth in the appellant's brief (p. 26). While an extreme and unusual case it shows the injustice to the general public that may result from the Commission's broad and sweeping order. "Take, for example, the owner or owners of a hunting or fishing cabin in the wilds of McKean County, near one of the Company's high-pressure transmission lines carrying from 100 to 300 pounds pressure, where the only use of gas would be for cooking for a short time, once or twice a year. The location is miles away from any meter-reader; the pressure would require, for safety, the installation of at least three regulators, one stepping the pressure down from 300 pounds to 150 pounds, one from 150 pounds to 75 pounds, and another from 75 pounds to four ounces, costing perhaps $80, for a return, with no minimum charge, of $2 or $3 a year. Is such a situation fair, either to the Company or to its other consumers? Such an application, if and when made, should, we submit, be subject to consideration by the Company and, if necessary, to review by the Commission in the light of all the circumstances and implications involved."

Appellant's counsel pertinently continued: "Furthermore, the position of the Commission that the cost of installation was less on the Company's high-pressure lines than on its distribution systems, however unfounded and unsupported by evidence it may be, is only part of the consideration that must be given to such installations. The cost and maintenance of such installations may be, and in fact is, out of all proportion to the cost and maintenance required for installations on the low-pressure distribution system. Periodical trips, usually once a month, must be made by a meter reader from the Company's nearest office. One more experienced than an ordinary meter reader is required unless a mechanic capable of making adjustments to

the regulator equipment is taken along, in which case the expense of the trip is more than doubled. Transportation must be furnished. Many of these locations will probably be in isolated territory, and very likely inaccessible by automobile road, especially in the winter time. The primary purpose of such transmission lines is not the furnishing of gas to individual consumers, but transporting gas to the distribution centers. The pressures must vary with the demand caused by weather conditions, the number of wells on the line, consumption at the other end, and other factors known to every experienced gas man. No provision is made, however, in this blanket order for such conditions. Besides, in the operation of the Company's business, it may be desirable, if not necessary, to change such lines completely, or to relocate them; and such service must in any event be subject to contingencies, which the order here does not take into account or consideration, but which must be regulated and controlled by the Company. It is entirely beyond dispute that vital matters, of the utmost concern to the Company and to its customers, were not and could not be given consideration because there was no opportunity to present them in a case involving only the narrow issue of the reasonableness of a labor charge. To close the door on any opportunity to present and analyze and discuss these considerations on a basis of cool reason, and further to attempt to justify by matters entirely outside the record, seems to us to convict the Commission of being not only unreasonable but arbitrary."

Although not referred to, or relied upon, in either of the Commission's orders, counsel for the Commission in his brief argues that appellant should not have the right to require that any consumer who is served with gas from a transmission main, instead of from a distribution system, shall pay the cost of furnishing and installing the regulator equipment necessary to step down the pressure so as to make it safe for household

use, because its *tariff* filed with the Commission made no provision for such payment by him. See "Tariff", Art. I, sec. 2, par. (22) of The Public Utility Act of 1937, P. L. 1053, 66 PS Sec. 1102, (22).

The regulation, carrying into effect the settled practice of the company, as evidenced by the petition of the complainants and other such consumers asking the Commission to permit them to be supplied with gas by the appellant, "under its usual conditions", and by the written applications for such service duly accepted by the Company in which the applicants agreed to pay the cost of installing the regulators and appliances necessary—all of which were before the Commission without objection to the validity of the contracts—should properly have been filed with and submitted for approval to, the Public Service Commission as a 'reasonable regulation' authorized by the Natural Gas Company Act. But the Commission did not base its action on the failure of the company to have filed such regulation with the Commission. Quite the contrary. It based its ruling on its own construction or interpretation of Circular No. 9-A. This is conclusively shown by the fact that in the Fayette County Gas Company case, a companion case, [immediately succeeding this case] argued immediately following this one, the gas company had filed such a regulation in 1928, and had acted under it without objection from the Public Service Commission, or its successor, the Public Utility Commission, until the complaint in that case came before it, and yet the same ruling was made as to the effect of Circular No. 9-A as was made in this case.

Therefore we shall not rule this case on that ground, but shall take the fact into consideration in disposing of the costs.

It is proper to add that the transmission main involved in this case was not laid in a public highway but in a private right of way secured from the abutting

landowners. Hence the rule laid down in *Panther Valley Water Co. v. P. S. Comm.*, 70 Pa. Superior Ct. 8, as to the cost of installing and maintaining the service pipe from the distribution lines to the curb line, has no application here.

Our Supreme Court has ruled (*Stephany v. Equitable Gas Co.*, 347 Pa. 110, 31 A. 2d 523) that no duty rests on a gas company to maintain the private line of a customer in serviceable condition.

The appeal to No. 12 April Term 1943 is sustained. The order of the Commission entered February 10, 1942 is reversed and set aside, and the record is remitted to the Commission with directions to dismiss the complaint.

As the complainants did not ask for or contemplate the action taken by the Commission we shall not impose any costs on them, but order each party to pay its own costs.

This action renders it unnecessary for us to dispose of the appeal to No. 30 April Term, 1943. Had the decision on No. 12 been the other way, we would have sustained the appeal to No. 30, and ordered a rehearing of the case. See *Horton v. W. Penn Power Co.*, 119 Pa. Superior Ct. 465, 470-5, 180 A. 56.