Fayette County Gas Company, Appellant, *v.* Pennsylvania Public Utility Commission.

272

Argued April 22, 1943. Before KELLER, P. J., BALD-RIGE, STADTFELD, RHODES, HIRT, KENWORTHEY and RENO, JJ.

*David E. Mitchell,* for appellant.

*Samuel Graff Miller,* with him *Harry M. Showalter,* for appellee.

OPINION BY KELLER, P. J., September 9, 1943:

This is a companion case to *United Natural Gas Co. v. Penna. P. U. Comm.,* 153 Pa. Superior Ct. 252, 33 A. 2d 752, [the immediately preceding case]. The Commission's interpretation of Circular No. 9-A, 'Rules and Regulations pertaining to Gas Service Utilities', adopted by the Public Service Commission on April 9, 1914, as declared by it in the *United*

*Natural Gas Company* case, was confirmed and applied to the facts in this case, resulting in an order sustaining Mrs. Elias' complaint, and further directing the respondent, Fayette County Gas Company—hereinafter called Fayette—(1) within thirty days, at its own cost and expense, to furnish, install and maintain the necessary gas service line, together with all regulator equipment and meter, and furnish gas service to complainant at her described location; (2) to cease and desist from charging an applicant or a consumer for the installation of a service line in a public highway; (3) henceforth to furnish and install at its expense all regulating equipment necessary to render service as required in Circular No. 9-A; (4) in the present complaint and henceforth to furnish and install at its expense all service lines in a public highway; (5) to file within ten days a supplement to its rules and regulations, cancelling its tariff rules made part of this record, identified as respondent's Exhibit No. 3, Supplement No. 1 to Gas—Pa. P. U. C. No. 4, First Revised Leaf No. 21, cancelling Original Leaf No. 21.

Our decision in the *United* case, overruling and setting aside the Public Utility Commission's interpretation of the regulation from Circular No. 9-A involved in these appeals, requires the reversal of the Commission's order entered in this case and the dismissal of the complaint. But the attendant facts and circumstances in this appeal are such that the order of the Commission here appealed from is even more unreasonable and arbitrary than in the *United* case. They may be stated as follows:

The complainant, Sarah Elias, lives with her husband in a two-story frame house located along the east side of State Highway Route No. 119, about two miles from the town of Dunbar. The house sets back 53 feet from the highway. The title to the property is in her husband. On land appurtenant to this house, a frame lunch stand, 16½ by 12 feet, is located 464 feet north-

east of the house. This lunch stand is leased to and operated by a Mrs. Frank Scolavin. It sets back about 20 feet from the highway, which curves to the east at that point. The complainant, either singly or with her husband,—the record is not clear—conducts a liquor license at the frame house on the premises, and wants gas service for cooking and hot water at the house, and for a hot plate at the lunch room. The estimated revenues to be derived from the licensed house would be about $2.50 per month; from the lunch stand, about seventy cents a month. The respondent, Fayette, has no distribution system nearer to the Elias property than Dunbar, two miles away. However, an eight inch high-pressure transmission main is located under the cement concrete paving in the state highway directly in front of the lunch stand, on the opposite side of the road, abutting property of Mrs. Jennie Agbay. The highway is 50 feet wide of which the middle 18 feet is concrete with a three-foot asphalt strip on each side and a 13-foot macadam berm on each side of that. A few feet west of the lunch stand the eight-inch high-pressure main leaves the highway and continues in a straight line, by private right of way, through the Agbay property, until it passes the Elias house, where it is 269 feet distant, with the highway running between.

As we explained in the *United* case, in tapping a high-pressure natural gas main for consumer use, in order that the service may be safe, one or more regulators must be used in order to reduce or step down the pressure so as to make it safe for household consumption. In the present case, respondent's engineers said that two regulators would be required—one to step down the high pressure in the transmission main to a medium pressure of five or ten pounds per square inch, and the other to reduce that medium pressure to the low pressure needed for household consumption, to-wit, four to eight ounces per square inch. These regulators

should be installed right at the high-pressure main tap; and they cannot well be placed in the highway. To preserve them from the weather, which would otherwise cause them to deteriorate, they must be housed in a wooden box. Good engineering requires also that the pipe leading across and under the highway to the consumer, should be a low-pressure pipe.

In 1928, Fayette filed with the Public Service Commission the rules and regulations established by it with reference to service from high-pressure mains. These rules have been in force since they were established and filed, without objection on the part of the Public Service Commission, or the Public Utility Commission, prior to this case, and since that date all connections from high-pressure mains, in rural districts where no distribution system exists, have been made in conformity with them.

These rules provided:

"9. Additional Rules—Service from High Pressure Mains. The line from which gas is supplied by company is not intended and cannot be maintained solely for service to scattered customers in rural districts. The company may, at its discretion, cease to furnish gas, either temporarily or permanently, change, repair or remove its pipe line or change the use of it, without prejudice to the right of the company to continue its supply to other customers. In case of cancellation of contract for service from high pressure mains, thirty (30) days' written notice shall be given by the one cancelling to the other party. The company shall not be liable for any deficiency in the supply caused by the use of compressing stations, breakage of lines, or other causes, or for any claim for damages on account of anything done under the provisions of this paragraph.

"The place of delivery of the gas is at the tap on company's pipe line. The customer will furnish, install and maintain, at his expense:

"(a) The necessary service line to transport gas from the company's pipe line to the point of consumption.

"(b) The necessary regulator or regulators and safety appliances, required to reduce the pressure from the maximum pressure on the company's line to eight (8) ounces.

"(c) A safety blow-off valve or a fluid seal, which is to be connected on the outlet of the meter, so adjusted as to operate and relieve any pressure on the customer's line over sixteen (16) ounces.

"(d) A substantial and suitable covering for the said regulator or regulators and meter, so that same will be protected from the weather and from being interfered with by irresponsible parties.

"The type and number of said regulators and safety appliances, including the installation thereof, is subject to inspection and approval of the company before gas will be turned into customer's lines. Said regulator or regulators are to be installed at the tap on the company's line.

"The company will furnish, install and maintain, at its own expense:

"(a) A meter, which will be attached to customer's service line at the outlet of the low pressure regulator.

"(b) Tap its main or pipe line, provide a nipple and stop cock to turn on and shut off gas from customer's service line.

"The customer shall not interfere with said regulator or meter, except to see that same are kept in proper working order; neither shall customer increase the pressure on same without the written approval of the company. Such interference will be sufficient cause for the discontinuance of service."

When Mrs. Elias asked the respondent for gas service as above set forth, she was informed, in substance, of the rules regulating service from high-pressure mains,

and that she would have to procure permission for the use of Mrs. Agbay's land for the installation and housing of the regulators and pay for the cost of the same and for the laying of the service pipe from the regulators, and under the highway, a distance of about 60 feet, to the east side of the highway, where the Elias property abuts it. The total cost of the regulators, their housing, and the digging or tunneling under the highway would be about $97.03, made up as follows: Pipe, and highway permit, including crossing of the highway, $47.25; cost and installing regulators, $37; Regulator housing, $12.78. This, in addition to whatever expense, if any, Mrs. Elias would have to pay for obtaining the easement thus imposed on the Agbay property. It was shown that the average cost to the company for a service connection to the curb line from a low-pressure distribution line located in a street was $14.57.

She refused to proceed on that basis and complained to the Commission with the result above indicated. The Commission refused appellant's petition for a rehearing.

From these facts, and our rulings in the *United* case, supra, we arrive at the following conclusions.

1. The law imposes no duty on a natural gas company to serve *every* person, corporation or association within its charter field of supply with gas, but only such persons, etc. "within convenient connecting distance of its line of pipe as may desire to use the same, upon such terms and under such reasonable regulations as the gas company shall establish"; said regulations to be subject to the provisions of the Public Utility Law and the lawful rules and orders of the Public Utility Commission made pursuant thereto.

2. The normal and economical method is to transport natural gas in transmission mains under high pressure, but to supply it to consumers from a low-pressure distribution system, the pressure having been reduced

to a pressure safe for consumption by regulators installed and maintained by the company at its expense.

3. Where consumers are not within convenient connecting distance with a low-pressure distribution line and ask for a connection with a high-pressure transmission main, the expense of installing, housing and maintaining the regulator or regulators necessary to reduce the pressure so as to be safe for household consumption, being for their individual benefit, must be borne by them.

4. A reasonable ground for discrimination exists between consumers connected with a low-pressure distribution line and those seeking service from a high-pressure transmission main.

5. The ruling of this court in *Panther Valley Water Company v. P. S. Comm.,* 70 Pa. Superior Ct. 8, will be applied to customers of a natural gas company served from a low-pressure distribution line, located in a public highway. It will not be applied to service from a high-pressure transmission main, where regulator or regulators are required to step down the pressure to make it safe for consumption.

6. Circular No. 9-A adopted by the Public Service Commission on April 9, 1914, containing Rules and Regulations pertaining to Gas Service Utilities, was intended to apply to natural gas service to consumers from a low-pressure distribution system. It does not cover the preliminary steps necessary where consumers seek direct connection with a high-pressure main and regulators must be installed to reduce the pressure to that fixed in the Circular as safe for consumption at the consumer's meter outlet.

7. The right of eminent domain is given a natural gas company by the Act of May 29, 1885, P. L. 29 (and its amendments of May 11, 1897, P. L. 50, and April 5, 1927, P. L. 115) "for the laying of pipe lines [1] for the

---

[1] The context shows that this means the corporation's pipe lines, not service pipes or lines of customers.

transportation and distribution of natural gas" to the public. Except as respects service pipes from distribution lines laid in streets and highways by the consent of the proper municipal authorities, it does not apply to service lines laid for the benefit of an individual consumer. The property of A can be taken in eminent domain proceedings, as a public use, for the benefit of the public generally. It cannot be taken for the sole benefit of B. Therefore, if a service pipe intended for the sole use and benefit of B, must cross the land of A, B must secure such right of way from A. The company has no right to condemn it; any more than a railroad company can condemn A's land for a siding intended for B's sole, individual benefit. Nor can the Public Utility Commission order the utility company to condemn it for B's individual benefit (*Lycoming Edison Co. v. P. S. Comm.*, 67 Pa. Superior Ct. 608; *Erie & Wyoming R. R. Co. v. P. S. Comm.*, 74 Pa. Superior Ct. 338; *Lehigh Nav. Coal Co. v. P. S. Comm.*, 133 Pa. Superior Ct. 67, 1 A. 2d 540.

8. The Public Utility Commission may order a natural gas company to extend its *distribution* system, even though not immediately profitable, where there is a reasonable likelihood that it will prove profitable in the near future from additional customers to be secured (provided there is a sufficient supply of gas available, *Penna. Gas Co. v. P. S. Comm.*, 83 Pa. Superior Ct. 557, 566), but it may not order the company to install at its expense a *service line* to an individual consumer. In such case the consumer should pay the expense himself.

9. The gas company owes no duty to maintain a private service pipe in good and serviceable condition. Its duty, if the service pipe is in bad condition, is only to shut off the supply service until it is put into good condition by the consumer. *Stephany v. Equitable Gas Co.*, 347 Pa. 110, 31 A. 2d 523.

10. A natural gas company cannot reasonably be required by the Public Utility Commission to pay $97.43 costs and expenses to furnish and install a service line to a private consumer, whose estimated use will consume gas valued at $2.50 to $3 a month, that is, $30 to $36 a year. The cost to the company to produce or purchase the gas so consumed must be considered, and the outlay is unreasonable in comparison with the income—especially where, as here, the complainant may not install the gas at all or may discontinue its use at any time.

The order of the Commission appealed from is reversed *in toto* and the complaint dismissed—at the costs of the complainant, Mrs. Sarah Elias.