## Wyoming Val. Water Sup. Co. *v.* Pub. Ser. Com. of Pa.

Argued October 20, 1931.

Before Trexler, P. J., Keller, Linn, Gawthrop, Cunningham and Baldrige, JJ.

*Richard L. Bigelow,* and with him *Daniel W. Kaercher,* for appellant.

*E. Everett Mather, Jr.,* Assistant Counsel, and with him *John Fox Weiss,* Counsel, for appellee.

*Roscoe R. Koch,* for intervening appellee.

OPINION BY KELLER, J., March 5, 1932:

Three residents of Beaver Brook, a village in Hazle Township, Luzerne County, made complaint to the Public Service Commission asking that the appellant, Wyoming Valley Water Supply Company (hereinafter called Wyoming Company) be required to furnish water to the inhabitants of said village.

The complaint set forth that water was now being furnished to the inhabitants of the village by Charles M. Dodson & Co., a partnership, (hereinafter called Dodson & Co.), who until July 1928 operated a coal mine in that vicinity and supplied water without charge to the houses in Beaver Brook occupied by their tenants; that said Dodson & Co. had ceased operating said mine, had sold most of their houses and intended to discontinue the supply of water to the houses in the village.

The respondent appellant's duty to furnish water to this village was based by the complainants on the

fact that it is a public service company organized for the supply of water to the public in Wright Township, Luzerne County, and is the lessee of the Drifton Water Company, a public service company organized for the supply of water to the public in Hazle Township aforesaid, and is engaged in supplying water to the public in various places in Luzerne County, including said Hazle Township.

During the course of the hearing before the Commission the complainants presented a petition asking permission to withdraw the complaint; but Dodson & Co. were permitted by the Commission to intervene and continue the complaint, it appearing, by admission of their counsel, that the complainants had originally acted on their suggestion and that they were the 'moving factor in the case.' Fidelity-Philadelphia Trust Company was also permitted to intervene as a party complainant on the allegation that it was "Trustee under an agreement between all of the owners of certain land in the village of Beaver Brook on which residences have been built and which are occupied" and that the interests of the property owners for whom it is trustee were affected by the disposition of the complaint. Beyond filing this very indefinite averment of its interest the Fidelity-Philadelphia Trust Co. did not appear or participate in the case. It was suggested on the oral argument that it represented the interests of the Charlemagne Tower Estate, which owned the land from which Dodson & Co. had been mining coal under a royalty lease.

Counsel for both the complainants and the Commission have throughout their argument treated this case as if there rested on the appellant the absolute charter obligation to furnish water in every part of Hazle Township, from the mere fact that the Drifton Water Co.,—to whose rights and obligations it succeeded as lessee—in applying for a charter stated the purpose

of its incorporation to be the supply of water to the public in Hazle Township, Luzerne County. But this by no means follows. A township is the only recognized governmental division in this State for more sparsely settled communities. Villages, hamlets and towns (outside of incorporated towns created by special statute prior to the Constitution of 1873) have no legal recognition or boundaries in this State. If a community is not organized as a city, or borough, or an "incorporated town" as above described, it forms part of a township, and is governed by the township officers, that is, commissioners or supervisors, as the case may be, depending on whether its population makes it a township of the first or second class. It may have a post office and/or a railroad station, with the village name, but the state law recognizes it only as part of a township, except that it may be created a separate voting district within the township. It follows that when charters are sought for permission to operate a public utility, such as a water company, in a given village, hamlet or unincorporated town it is usual to state in the application that the place or district where it is to carry on the business contemplated, is the township in which it is located, that being the lowest governmental division recognized by law. But this does not mean, ordinarily, that it holds itself out as ready to perform its corporate functions everywhere throughout the township. Sometimes the commonly known name of the village or hamlet is designated as the place where the public is to be supplied, etc., but as it has no legal boundaries recognized by the State, it is usual to name the township. The corporation secures no exclusive right to serve the public in the whole township,—a half dozen different corporations may be chartered to serve a half dozen different communities in one township—and it assumes no corresponding absolute duty

to serve the public all over the township. It is unlike a water company chartered to serve a borough or city. This is apparent from the facts in this case.

Hazle Township is about twelve miles long by five miles wide at its widest point, and has an area of about fifty square miles, less that occupied by the City of Hazleton, which it surrounds on all sides. It has within it many towns, villages or hamlets not incorporated as boroughs. Drifton is one at its extreme northeast; Beaver Brook is another, near the western corner of the southern boundary, and fourteen miles distant from Drifton; Harwood is still another, northwest of Beaver Brook and several miles away. Charters for the supply of water to the public in all three of these communities were obtained. No one would have considered that the incorporators of a company to supply water to the public residing in Drifton were assuming a duty to supply water to the public residing in Beaver Brook, fourteen miles away, simply because its chartered field was described as Hazle Township, the only recognized state boundary it could name. But if it extended its field of operations near enough to another village or hamlet in the township, without a public water supply, to be able to supply it, without unreasonably taxing its resources, it might be required by the Public Service Commission to do so. But there is no "charter obligation" to go everywhere, all over the township. This must be kept in mind.

Had the respondent appellant done no more than lease the Drifton Water Company, it is not likely that anyone would have even considered requiring it to furnish water to these complainants. But it also leased, or otherwise secured, from another corporation, the right to furnish water to the public in the City of Hazleton and its vicinity, one of its mains being located 6400 feet north of Beaver Brook; and the complain-

ants thought that it was also furnishing water to a mine operation at the Yorktown colliery, about 1000 feet distant from the village in another direction, and when they filed the complaint had in mind that water would be furnished by the respondent from that point. It developed, however, that the pipe line referred to was a private line of the Lehigh Valley Coal Co. and hence is out of the picture. If, therefore, the respondent is obliged to furnish water from its own plant to this village it must connect with the system at a point 6400 feet north of the village, and a connecting line will have to be built.

The testimony in the case is very inexact and indefinite. The only witness who testified for the complainants attempted to give evidence as to matters which occurred long before his connection with Dodson & Co. began, which was in May, 1927; and his testimony was not accompanied by the production of documentary evidence which would have been illuminating, if not conclusive. But accepting it for what it is worth, it appears that Dodson & Co. began mining coal at the Beaver Brook colliery in this vicinity many years ago under a mining lease or sale of coal on a royalty basis; maybe as far back as 1870 or 1880. Houses were built for the employees on part of the land, forming a village known by the name of the colliery, but when this was done, or whether the houses were built by Dodson & Co., does not appear. In 1896 Dodson & Co. secured a charter for a company known as Beaver Brook Water Co., whose purpose was the ''supplying of water to the public for steam and domestic purposes in the town of Beaver Brook, Luzerne County, and vicinity.'' Several artesian wells were drilled by Dodson & Co., a water tank erected, and pipe lines laid through the village, and service lines run to the houses —one for every double house or two dwellings. The water system was intended primarily for the colliery,

but water was supplied to their tenants without charge in connection therewith. Just when Dodson & Co. began to supply water to the tenant houses,—whether before or after the incorporation of the Beaver Brook Water Co.—does not appear. The commission in its report states that the village has been thus supplied with water for approximately fifty years, but there is no competent evidence to support the statement. While Mr. Christ, complainants' only witness, did say in one part of his evidence that the service had been established "back in the 70's or 80's when Charles M. Dodson & Co. took over ownership of Beaver Brook, or the operation," he later admitted that he had no knowledge on the subject, stating (73-a) that he could not say whether the Beaver Brook Water Co. which was incorporated in 1896 was organized before or after water service was being rendered in the village. "They were mining before that time, but as to furnishing the village with water I am not prepared to say." The evidence seems to show that the original distribution system, except for repairs and replacements caused by mine subsidence, is still in use, and the testimony is that the transmission pipes and service lines are about thirty years old, which would place its construction about the same time or soon after the incorporation of the water company. If the pipes were laid fifty years ago, it would substantiate the respondent's evidence that the transmission system is useless for connection with its lines. Just why the Beaver Brook Water Company was chartered does not appear. Mr. Christ, who was in charge of Dodson & Co.'s mining operation from May 1, 1927 until early in 1929, said that it never operated the water plant. It preserved, and still does, its corporate organization, is owned and controlled by Dodson & Co., and Mr. Christ said "they had the same directors," meaning probably that the active managing

partners of Dodson & Co. acted as directors of the water company.

In 1927, seven persons who had been employed at the Yorktown colliery moved their houses into Beaver Brook village and located them on land which they bought from Dodson & Co. They were supplied by Dodson & Co. with water at the flat charge of $25 a year. A rendering plant was likewise supplied, with water by Dodson & Co. at a flat charge of $60 a year. For how long water rent was collected from the rendering plant does not appear. The remaining buildings, consisting of eighty-two houses, school house, store and gasoline station were tenants of Dodson & Co. and paid no distinctive water rent.

By July 1, 1928 Dodson & Co. had mined all the coal that in their opinion was merchantable or could be mined profitably, and ceased operating. Subsequently, they sold their mining rights to Pardee Bros. & Co., and all of the houses occupied by their tenants except seven were sold to the respective tenants. The sale of the mining operation to the Pardees carried with it, apparently,—though the agreements were not produced or offered—the right to use the water of Dodson & Co.'s well, and the storage tank, and the distribution system to the colliery, which was part of the transmission line to the village, and since then Pardee Bros. & Co. have been pumping the water and billing to Dodson & Co. for the proportion of the water used in the village, about $42.50 per month, the latter in turn collecting water rent from the rendering plant and seven houses moved from Yorktown but making no charge for the water furnished the remaining houses. In writing to respondent concerning their agreement relative to this water service, Pardee Bros. & Co. stated that "the water plant at Beaver Brook colliery ......belongs to the Beaver Brook Water Co.," but the agreement itself was not produced, so that it might

be disclosed whether it contained an admission by Dodson & Co. of ownership of the water plant in the Beaver Brook Water Co., and Mr. Christ testified that the water plant was owned and operated by Dodson & Co. Previous to causing the institution of this complaint Dodson & Co. tried to sell the entire water plant to the respondent and to Pardee Bros. & Co., offering it to the former for $10,000, although claiming for it a replacement value of $44,773, and suggesting to the latter that it would be to their interest to buy it before the sale to Wyoming Company was consummated. This offer included the franchise of the Beaver Brook Water Co., and Dodson & Co. stated that they would be in a position to secure a lease or purchase of the necessary right of way which the Wyoming Company might need, at reasonable rental rates or selling prices.

Pardee Bros. & Co. bought the mining rights for the purpose of salvaging whatever coal was left in the mining field, and none of the houses, nor the road nor right of way in which the distribution and service pipes are laid have any right of surface support. The supply pipe from the well and storage tank to and through the village runs in or along a state highway, which it is contemplated will be relocated and the coal pillars under the present state highway will probably be removed. As it is now there are surface subsidences which cause breaks in the distribution lines. Pardee Bros. & Co. wrote Wyoming Co. on November 29, 1930, that "the main water line from No. 5 slope to Beaver Brook village [the distribution line] is a continual source of trouble due to surface subsidence in the area over which it is built;" while Mr. Christ said the amount paid by Dodson & Co. on that account for 1930 was only $35.43.

After the complainants had closed their case, Dodson & Co. offered to convey the pipe lines marked in red on a map in evidence with an adequate right of way

on which the pipes are now located—being evidently the distribution line and service lines in the village—to the Wyoming Company, and also a sufficient right of way for the Wyoming Company to connect the Dodson system of pipes with their main located in the proximity of the Hazleton Brick Company's plant. This offer did not include the Dodson's well and water tanks —nor was any evidence given as to the effect of this conveyance on the agreement between Dodsons and Pardee Bros. & Co. relative to the use of water for the mining operations.

Wyoming Company's officers testified that the present system of distribution pipes in the village would be of no use to it; that to convey water from its present main near Hazleton would require the laying of 6400 feet of new six-inch pipe and new separate service pipes to the dwellings, instead of the present service pipe to every two houses; that the water pipes now in use are old and practically worn out and useless for its purposes; and that the expense of construction would be $18,000, which new line would be subject to the dangers of surface subsidence; and that the additional cost of supplying water from their own supply sources would be ten cents a thousand gallons. Complainants claim that the new line need only be laid for 4000 feet, at a cost of $8000.

When Pardee Bros. & Co. finish salvaging the coal yet remaining, the mining operation will cease and the inhabitants will have to seek employment elsewhere, traveling daily to their new place of work, or move away. There is no certainty that the operation will last for any period. At the most it will not take over eight or ten years. Pardee Bros. & Co. informed Wyoming Company that they would be willing to purchase water from it, provided the aggregate annual cost did not exceed what it was now costing them, about $100 a month. There is no likelihood of the

village growing; when the coal salvaging operation ceases it will be for mining purposes a dead town.

The question before us is whether with these facts and in these circumstances the order of the Commission requiring Wyoming Company to furnish water to the village of Beaver Brook is reasonable.

Dodson & Co. are a de facto public service company. Since 1927, at least, and perhaps longer than that, they have been selling water produced by them for profit to persons, constituting the public in Beaver Brook Village, who were not their tenants. They are directly within the definition of a "public service company" given in section 1 of the Public Service Company Law. They are also the owners of a corporation organized to supply water to the public in this village, and while it has never apparently operated as a water company, it has a franchise to do so, which could easily transform the operation from a de facto public service company to a de jure one. Having this water plant, from which for at least thirty years the people in the village have been supplied with water, they endeavored on ceasing mining operations to dispose of the water supply of the village to Wyoming Company for $10,000 and being unable to persuade the latter to buy it caused this proceeding to be instituted to compel its purchase or the substitution of a new source of supply by Wyoming Company at great expense.

Being desirous of escaping the expense and responsibility which they assumed years ago they are attempting by this proceeding to compel an outside company, which has no lines within one and one-fifth miles of the village, to take over the responsibility and expense of which they hope to divest themselves. Though they are the owners, and in control, of a corporation chartered to supply water to the public in this very village, they seek, without dissolving that corporation

and surrendering its franchise and corporate powers, to compel respondent to perform the public service for which they themselves secured and retain that charter. And though they are themselves furnishing water in such a way as to make them a public service company, they have not abandoned or given up, and do not propose to abandon and give up, their water supply and transmission pipes in toto, in so far as relates to their agreement with Pardee Bros. & Co. but only as respects the supply to the village.

The original complainants having withdrawn from the proceeding we are of opinion that Dodson & Co., who were permitted to intervene and continue the complaint, are not in a position to ask the Commission to shift the responsibility, which they assumed, from their shoulders to the Wyoming Company, and that the Commission cannot in the circumstances before us order the latter to furnish water to the village to the relief of Dodson & Co. and the water company owned and controlled by it; that Dodson & Co. having appeared in the proceeding should be required by the Commission either personally or through their wholly owned and controlled corporation to continue the supply of water to the village.

There is not one argument advanced by the counsel for the intervening appellees or the Commission why Wyoming Company should be required to perform this service which is not even more applicable to the intervening appellees or their owned and controlled water company.

We consider it unreasonable to require the respondent located over a mile away from this village, whose continuance for any considerable length of time is problematical, to expend a sum in the neighborhood of $18,000 when a water supply system is already functioning there without complaint by those served.

But, say counsel for the Commission, it is not neces-

sary to expend any such sum of money; that the Commission evidently contemplated the continuance by respondent of the present system, without the laying of any pipe—or the incurring of capital expense—the operation of the well, pump and water tank by Pardee Bros. & Co. and the division of the cost in proportion to the water used, the respondent collecting from the houses in the village $25 a year, the sum paid by those who now pay for water service. But Wyoming Company will have to buy the well, pump, and water tank from Dodson & Co., or arrange to lease the supply system, for they were not included in the Dodson offer—the offer, in fact, was based on the condition that the Commission would order Wyoming Company to connect the village with its Hazleton main. Dodson & Co. or its owned and controlled corporation, on the other hand, can, at no capital outlay or expense, do just what it is proposed the respondent should do. Whether the people now being furnished with water free would pay $25 a year for it may be problematical, but it is just as much so for the respondent as for Dodson & Co. or Beaver Brook Water Co.

But it is argued that neither Dodson & Co. nor the Beaver Brook Water Co. ever received a certificate of public convenience from the Commission and that the operation of the water system by Dodson & Co. for profit as a public service company was unlawful. True. But an order of the Commission requiring them or the Beaver Brook Water Co. to maintain the service of water to the public in the village is in itself a certificate of public convenience, sufficient to make the service rendered under it lawful. Certainly the intervening complainants are not in a position to take advantage of their own wrong and advance their previous unlawful operation of the plant as a reason why they should not be required to furnish lawful service.

Nor is it to be contemplated, as argued by counsel

for the Commission, that if the Commission orders the Beaver Brook Water Co. to supply the very service for which it was chartered and received its franchise, that the Attorney General's Department, which has viewed with equanimity the inactivity of the company for all these years, would even think of moving to forfeit its charter, when pursuant to the orders of the Commission it undertook that duty to the manifest advantage of the public in the village and the injury or disadvantage of no one. Such a course is not to be thought of.

There is no likeness at all between this case and that of Overlook Development Co. v. P. S. C., 101 Pa. Superior Ct. 217, affirmed by the Supreme Court on January 5, 1932, as suggested by counsel for intervening appellees. Beaver Brook Water Co. is owned by Dodson & Co. For their own purposes, which may be surmised, but need not be determined, Dodson & Co. have kept alive this corporate franchise which authorized them to do just what the Commission should order them to do. They will in the performance of that order use nobody's water supply and distribution service but their own.

As the case was presented to the Commission, and on the record now before us, we think its order requiring appellant to furnish water to the residents of Beaver Brook Village in relief of the corporation specifically authorized by its charter to do so, was unreasonable and not in conformity with law.

The order is reversed and the record remitted to the Commission for further proceedings not inconsistent with this opinion.