Ridley Township, Appellant, *v.* Pennsylvania Public Utility Commission.

474

Argued October 10, 1952. Before RHODES, P. J., HIRT, RENO, DITHRICH, ROSS and GUNTHER, JJ. (ARNOLD, J., absent).

*Joseph Sharfsin,* with him *R. Paul Lessy,* for complainants, appellants.

*Jack F. Aschinger,* Assistant Counsel, with him *Lloyd S. Benjamin,* Acting Counsel, for Public Utility Commission, appellee.

*Ernest R. von Starck,* with him *Robert H. Young* and *Morgan, Lewis & Bockius,* for water company, intervenor, appellee.

OPINION BY RENO, J., January 20, 1953:

This is the appeal of the Township of Ridley and 12 property owners from an order of the Pennsylvania

Public Utility Commission dismissing their complaint against the Philadelphia Suburban Water Company, intervening appellee, for refusing their request for an extension of its facilities.

Ridley is a township of the first class, located in Delaware County, within the Company's chartered territory. Its population of 8641 in 1940 was increased to 17,212 in 1950, an increase of 8571 or 99%, which is comparable with the increase in Delaware County of 33% and in Pennsylvania of 6%. According to the map of the United States Census Bureau it lies adjacent to the City of Chester, and of its total population, 15,636 inhabitants are included in the Philadelphia Urbanized Area.[1] A map of the part of the Township here involved, introduced in evidence, bears the legend, "17 minutes from Broad St. [Philadelphia]."

The appellants sought an extension of the Company's facilities in a residential section of the Township known as Faraday Park, a part of which is already served by the Company. The Township requested the installation of a fire hydrant and the property owners desired water for their homes. It is not necessary to describe further the conditions prevailing in the area, for the Commission found "that there is *need* for the extension facilities and service." Unless other substantial and competent evidence negatived that finding the Commission should have sustained the complaint, since the Public Utility Law of May 28, 1937, P. L. 1053, §401, 66 P.S. §1171, clearly commands that "Every public utility . . . *shall* make all such . . . *extensions* . . . as shall be *necessary or proper* for the ac-

---

[1] These facts do not appear in the testimony. They have been abstracted from the report of the United States Bureau of the Census of 1950, and we have taken judicial notice of them. 9 Wigmore, Evidence, §2577.

commodation, convenience, and *safety* of its patrons
. . . and the public."[2]    (Emphasis added.)

The majority of the Commission based the dismissal
of the complaint upon the finding: "We find, however,
that it is not economically feasible or reasonable for
the water company to provide the extension facilities
and service and bear all of the cost; and that it would
be an unfair burden on the water company's other cus-
tomers." This finding reproduces almost verbatim the
concluding averment of the Company's answer and is
not supported by the evidence.   An order of the Com-
mission cannot stand unless it is based upon substan-
tial and competent evidence "having a rational pro-
bative force", upon "such relevant evidence as a rea-
sonable mind might accept as adequate to support a
conclusion." *Pittsburgh & Lake Erie R. R. Co. v. Pa.
P. U. C.,* 170 Pa. Superior Ct. 411, 416, 85 A. 2d 646.

The extension would require laying 1547 feet of
pipe.   The Commission found that the cost of the ex-
tension would be about $6,950 to service the fire hy-
drant and 8 prospective domestic consumers and that
the annual net income, after giving effect to operating,
maintenance, depreciation and income tax charges,
would be $65.71, a return of .95% on the investment.
Should the Company serve the hydrant and 20 cus-
tomers the investment would come to $7,600, with an
annual net income of $182.93, a 2.4% return.   Appel-
lants question these findings but there is evidence to
sustain them, and the exigencies of the case do not
call for a minute examination of the figures.

The Company's balance sheet, introduced in evi-
dence, shows total assets in 1950 of $42,458,124.41, an
increase of $3,193,016.48 over 1949.   Its current and
accrued assets in 1950 were $3,270,429.61, an increase

---

[2] The difference between *need* and *necessary* is so subtle that
only a lexicographer can recognize it.

of $474,933.77 over 1949. Its earned surplus in 1950 was $4,708,323.19, an increase of $536,907.47 over 1949. "Not economically feasible" is an elusive phrase and may mean anything. If it means that the Company lacks the resources to make the extension, the evidence will not support the finding. For the evidence conclusively shows that the extension would entail the expenditure of less than one-fourth of one per cent of the Company's current and accrued assets.

Nor is there any evidence showing that extension "would be an unfair burden on the water company's other customers." If the Commission means by that phrase that the extension would require an increase of the rates payable by other patrons, there is not a shred of competent evidence to support the finding. The Company and the Commission contend that proof of increased rates would compel "a full-scale rate case", which is patently fallacious. The purpose of an inquiry upon a complaint for refusing an extension of facilities is not to establish rates but merely to determine the effect of an extension upon the total return from the overall operation of the entire system. The rate of return on the extension has been shown. If this figure had been supplemented by proof of the Company's total revenues and expenses, the relation which the extension bears to its entire business, and its allowable and actual rate of return, a simple mathematical calculation would have demonstrated whether a general rate increase was prima facie indicated by the 1500 foot extension.[3]

---

[3] Cf. *Phila. Rural T. Co.*, *v. P. S. C.*, 103 Pa. Superior Ct. 256, 261, 158 A. 589, where this Court, affirming an order requiring an extension, said: "It [the utility] made no attempt to prove its total investment in its business, nor its total revenues and expenses, nor the relation which the extension bears to its total business."

A public utility cannot collect the cream in its territory and reject the skimmed milk. "A public service corporation may not 'pick and choose' only presently profitable territory covered by its franchise. If a portion of the territory served is not profitable, but the entire service produces a fair return on the investment, the utility may still be required to serve the unprofitable portion, if the rendering of such service does not result in an unreasonable burden on its other service": *Phila. Rural T. Co., v. P.S.C.,* 103 Pa. Superior Ct. 256, 261, 158 A. 589. Although the Company does not enjoy a monopoly in the Township it is obliged to render service within a reasonable distance from its distribution system, and if it takes only the profitable business no other water company will enter the area to pick up the unprofitable business which it declines. No other company will become "a snapper-up of its unconsidered trifles."

The reasonableness and validity of the Commission's suggestion[4] that appellants bear part of the cost of the extension rests upon the same factors hereinbefore discussed. Ordinarily, it is not the business of the citizen or consumer to construct any part of a utility's system. There are, doubtless, instances where, under special circumstances, warranted by the evidence, the Commission may, in the exercise of its administrative discretion, withhold exercise of its power unless patrons

---

[4] "It is not unusual in such instances for interested parties voluntarily to offer to participate in the cost of an extension by agreement, usually providing for refunds for each additional abutting customer; such participation being for the purpose of making the extension a reasonable one for the water utility to make. Such participation cannot be required by either the utility or this Commission, but the Commission would give consideration to such a voluntary offer to participate, in making its determination in the case. However, there is no such offer of record in this instance."

offer to participate in the cost of construction. *Altoona v. Pa. P. U. C.,* 168 Pa. Superior Ct. 246, 77 A. 2d 740. But no inflexible rule can be laid down; participation in construction costs cannot be exacted indiscriminately; and it cannot be required upon a mere showing that an extension will not immediately produce an adequate profit. The action of the Commission must rest upon evidence which shows that, without the contribution or loan of the consumers, the cost of construction would materially handicap the utility in securing a fair return on all its operations. *Riverton Consolidated Water Co. v. P. S. C.,* 105 Pa. Superior Ct. 6, 159 A. 177. Such proof, as already indicated, is lacking.

The obligation imposed upon the Commission to exercise its powers and discretion *reasonably* applies as well to patrons and the public as to the utilities. The Commission operates on a two-way street. "The primary object of the public service laws is not to establish a monopoly or to guarantee the security of investment in public service corporations, *but first and at all times to serve the interests of the public*": *Hoffman v. P. S. C.,* 99 Pa. Superior Ct. 417, 429. (Emphasis added.)

The Company relies principally upon *Sherman v. P. S. C.,* 90 Pa. Superior Ct. 523, 526, where this Court said: "We are not to be understood as holding that the extension of service of a public utility is dependent on the profit which may reasonably be expected therefrom; in proper cases such extension may be ordered though the immediate result of the expansion may entail financial loss to the company; but the company should not be subjected to unreasonable expenditures, nor the consuming public be unduly burdened, because of the over development or premature development of scattered sections of the city in advance of its normal

growth, when there is no rational expectation of the event justifying the expenditure." The principle has been followed and applied in *Wyoming Valley Water Supply Co. v. P. S. C.*, 104 Pa. Superior Ct. 432, 159 A. 340; *United Natural Gas Co. v. Pa. P. U. C.*, 153 Pa. Superior Ct. 252, 33 A. 2d 752; *Fayette Co. Gas Co. v. Pa. P. U. C.*, 153 Pa. Superior Ct. 271, 33 A. 2d 761. This Court still adheres to that doctrine.

However, the facts of these cases differ vastly from those in this record. For instance, in the *Sherman* case, the water company, which operated a gravity system of supply, was requested to extend its mains to lots "located on the hillside at elevations varying from 1,040 to 1,150 feet", the lowest of which was "150 feet away from the company's highest main in that neighborhood", and "11 to 127 feet above the company's reservoir." To supply the ten complainants the company would have been required to lay 1200 feet of high pressure pipe, and install a pumping system and a supply tank at an elevation of 1,170 feet, the cost of which would have been $14,564. The annual operating expenses would have been in excess of the probable return. This Court found: "There is no present likelihood of any considerable building development near or beyond complainant's properties", and affirmed the Commission's order denying the extension.

In the *Wyoming* case, the Commission had ordered an extension of one and one-fifth miles costing $18,000 to a dying coal town, formerly supplied by another water company whose distribution system was practically worn out, and this Court reversed. The facts in the *United* and *Fayette* cases bear no relation to those here presented.

This case does not fit in the factual pattern of the precedents upon which the Company relies. Appellants do not reside in a small hillside settlement with-

out prospects of future development or in a moribund mining village. They are residents of suburban Philadelphia, adjacent to the City of Chester, within a few minutes of travel to the center of the metropolis, and of a community whose increase of population during the last decade denotes civic stability and presages continued healthy growth and expansion. Nothing in the record suggests "over development or premature development of scattered sections of" the Township "in advance of its normal growth", and while the immediate returns from the extension may not now equal the overall return of the Company it cannot be said, on this record, that "there is no rational expectation of the event justifying the expenditure." These people are entitled to fire protection and domestic water service without subsidizing a large and prosperous utility.

The order is reversed and the record is remanded to the Commission for further action in accordance with this opinion.