Colonial Products Company, Appellant, *v.* Pennsylvania Public Utility Commission.

Argued September 17, 1958. Before RHODES, P. J., HIRT, GUNTHER, WRIGHT, WOODSIDE, ERVIN, and WATKINS, JJ.

*Robert B. Einhorn,* with him *Einhorn and Schachtel,* for appellant.

*Miles Warner,* Assistant Counsel, with him *Jack F. Aschinger,* Assistant Counsel, and *Thomas M. Kerrigan,* Counsel, for Pennsylvania Public Utility Commission, appellee.

*Frank B. Boyle,* with him *Laucks, Boyle & Monroe,* for intervening appellee.

OPINION BY RHODES, P. J., December 9, 1958:

On December 31, 1954, the Colonial Products Company, Dallastown, York County, filed a complaint with the Pennsylvania Public Utility Commission as to the service provided by the Dallastown-Yoe Water Company. It was alleged that the water company had refused to provide adequate pressure and quantities of water needed for the fire protection of the industrial property of Colonial and for the protection of life and property in the community of Dallastown.

Hearings were held on February 3 and March 11, 1955. Witnesses appeared on behalf of Colonial and on behalf of the water company; neither the authorities of the Borough of Dallastown nor any other customer of the water company appeared. After consideration of the evidence the commission concluded that the existing facilities of the water company were providing adequate public fire protection, and that the cost of the additional facilities desired by Colonial to improve its individual fire protection service would have been an unreasonable and unjust burden upon other customers of the utility.[1] The commission gave consideration to the fact that Colonial would not agree to participate with the water company in assuming the additional expense burden involved even though it would have been the major beneficiary of the improvements desired. Accordingly, the commission, by its order of February 20, 1956, dismissed the complaint of Colonial. After the dismissal on August 5, 1957, of its request for reargument, rescission, and modification of the order, Colonial appealed to this Court.

---

[1] The estimated cost of the additional facilities was approximately $10,000; the gross revenues of the water company for the year 1954 were $24,472; the additional facilities would not have resulted in any increase in revenues to the water company.

In substance the complaint of Colonial related to the amount of pressure and flow of water available for fire protection through the hydrant system and for maintenance of the plant sprinkler system.

Under section 401 of the Public Utility Law, 66 PS §1171, every public utility is required to furnish and maintain "adequate, efficient, safe, and reasonable service and facilities, . . ."

The Dallastown-Yoe Water Company has furnished water service to the public in the Boroughs of Dallastown and Yoe since 1918. Dallastown, here involved, has a population of approximately 3,500. The entire water system is operated by gravity from a standpipe having a capacity of 300,000 gallons, located at the highest elevation in the borough. All of the water is purchased from the Red Lion Water Company, located in the adjacent Borough of Red Lion, and is distributed through a grid system. In addition to the standpipe storage capacity the water company has available the storage capacity afforded by a 1,000,000 gallon storage reservoir of the Red Lion Water Company, located approximately five thousand feet from the connecting master meter.

Colonial manufactures wood products at its principal plant, a two-story industrial type building, located in Dallastown. Wood products are manufactured and stored within the building; rough lumber and inflammable finishing materials are stored outside. A monthly inventory of approximately $500,000 is maintained.

Colonial receives water at two connections which are supplied principally by three routes or systems of mains. The commission found that water is supplied to Colonial through the grid system of water mains extending generally throughout the borough; through approximately 1,680 feet of 4-inch main, extending across private property, which connects two

distribution mains from the standpipe with a 6-inch main supplying the Colonial property; and through a 6-inch line, installed in 1948 at the request of Colonial, which effected a more direct connection between the master transmission line from the Red Lion Water Company and one of the two principal mains serving the Colonial property. Actually, Colonial is served from water mains originating at the principal transmission line, from water mains originating at the standpipe, and from water mains integrated in the general grid system serving the borough. The water service for its fire protection purposes is supplied through a 4-inch service line installed on the property of Colonial.

Supplementary to the hydrant fire protection facilities, Colonial has installed in its plant a sprinkler system supplied by a 50,000 gallon capacity water tower. There are two hundred sprinkler heads attached to the distribution pipes in the plant of Colonial and these are supplied by gravity flow from the water tower. One of the witnesses for Colonial testified that a fire at the plant would require at one time the use of approximately fifty sprinkler heads, and that the water tank if full would supply the sprinkler heads in any one fire for approximately forty-five minutes without replenishment. Complaint was made to delays experienced by Colonial in filling the storage tank after periodic tests. It appears that the storage tank is replenished automatically through the water system of Colonial which in turn receives water from the water company connections. On occasions Colonial has refilled its water tower by using a fire engine pumper. Colonial itself maintains no pumping facilities for replenishing the water tower supply, although the installation of a pump would be beneficial.

In addition to the complaint regarding the sprinkler system, Colonial charged that the water pressure and flow at various hydrants and points in and around the plant were inadequate for proper fire protection. A lack of pressure and an inadequate flow were also given as causes for the difficulties encountered in the sprinkler system.

Two witnesses were called by Colonial to substantiate the charge of inadequate pressure and flow. Both witnesses were employed as field engineers or technical personnel by an industrial fire insurance company. One of these witnesses conducted pressure and flow tests on two occasions at points in and around the Colonial plant. He testified that he found a static pressure at five points ranging from 42 to 60 pounds per square inch; a residual pressure ranging from 12 to 29 pounds per square inch; and a rate of flow ranging from 500 gallons per minute to 805 gallons per minute.[2]

A witness for the water company who made tests of pressure and flow at various points near the Colonial plant found static pressure of 65 pounds per square inch, residual pressure of 50 pounds per square inch, and a rate of flow of 600 gallons per minute. The tests of this witness were conducted on a Saturday when the normal water usages throughout the system would be less than on a weekday. No weekday tests were made. The residual pressure test, however, was conducted simultaneously with the flow tests at a nearby hydrant.

---

[2] Static pressure is the pressure normally present without a flow of water. Residual pressure is the pressure normally present while water is flowing; it is lower than static pressure due to a friction loss caused by the movement of water through the pipes. Residual pressure is the more important for fire protection.

The expert witnesses for Colonial testified that under the existing water pressures fire hose stream lengths of 35 to 36 feet would be available, and, as we have indicated, the sprinkler heads required in a fire would operate 40 to 45 minutes, assuming that the water tower was full at the beginning of the fire. It was their opinion that the existing water pressures were inadequate when measured by the standards of water supply published by the National Board of Fire Underwriters. According to the standards of the fire underwriters for a community the size of Dallastown, a flow of between 1,750 and 2,000 gallons per minute for a duration of 7 or 8 hours under a pressure of 20 pounds per square inch must be maintained. In comparison, the expert witness on behalf of the water company stated that the water company was furnishing a reasonable supply of water to Colonial. In addition to the results of his tests, he testified that, assuming the use of fire pumper facilities, there was available a flow of 1,040 gallons per minute when pumping to a residual pressure of 20 pounds per square inch and a flow of 1,100 gallons per minute when pumping to a residual pressure of 15 pounds per square inch. He stated further that the standards of the National Board of Fire Underwriters represent optimum conditions and that they normally are not met by existing water companies, particularly those in operation for many years. We observe that a witness for Colonial employed by the insurance company acknowledged that the standards of the fire underwriters are the maximum standards.

In a proceeding on a complaint as to service the essential issue is whether the service of the utility meets the statutory requirement that it be adequate, efficient, safe, and reasonable. By its very nature, the statutory standard is not capable of definition with

mathematical precision. The duty is upon the commission in such proceedings to determine on the basis of the facts and circumstances indicated by the substantial evidence whether the service provided is reasonable and adequate for the public. In the exercise of that duty the commission is not bound to accept as the criterion of reasonable and adequate service the standards suggested by any one particular participant in the proceeding. Therefore in this case the commission was not obliged to accept as reasonable the standards for fire protection service as fixed by the fire underwriters, especially since these were optimum conditions and maximum standards prepared essentially for insurance purposes. The commission obviously rejected as reasonable the standards fixed by the fire underwriters. Instead it accepted the testimony of the expert witness for the water company who stated that the existing fire protection service was adequate and reasonable, and that with the use of fire pumper facilities there was available in the vicinity of the Colonial plant a flow of 1,040 gallons per minute to a residual pressure of 20 pounds per square inch and a flow of 1,100 gallons per minute to a residual pressure of 15 pounds per square inch. It is to be noted that such available supply of water and residual pressure do not fall too far short of even the optimum conditions desired by the fire underwriters, and approach Colonial's need, with use of a pump, according to Colonial's expert witness.[3]

Colonial contends that the commission improperly ignored evidence relating to a water shortage during a fire at the industrial plant of Guy Hobbs, Inc., in Dallastown, approximately a year prior to this pro-

[3] This witness testified that Colonial needed "1,250 gallons per minute at 20 pound residual pressure" which could be raised to 50 pounds.

ceeding. From the testimony, which is general and indefinite, it appears that the fire was serious and substantial. After the fire was in progress for some time a shortage of water apparently developed resulting in weakened hose streams. However, it also appears that the fire occurred in the freight storage section of the plant which was not equipped with a sprinkler system, and that it was of such substantial proportions as to require many pieces of fire fighting apparatus drawing large volumes of water. At most, this testimony established an unusually large fire and unusual water requirements. Considering the general nature of the testimony and the apparently abnormal proportions of the fire, we cannot say that the commission, in its fact-finding capacity, erred in affording this evidence little or no weight.

It was also permissible for the commission to give consideration to the fact that the improvements recommended by the witness for Colonial would inure mainly to the benefit of Colonial although they might tend incidentally to improve the service to other customers. The improvements would have had the effect of reducing the insurance protection costs of Colonial.

While ordinarily the cost of repairs and improvements in the system of a utility are to be borne by the utility as part of its duty to furnish and render reasonable and adequate service,[4] where, as here, special circumstances are present and the improvements desired are primarily for the benefit and convenience of one customer, the commission may give consideration

---

[4] Section 401 of the Public Utility Law, 66 PS §1171, provides:

"Every public utility . . . shall make all such repairs, changes, alterations, substitutions, extensions, and improvements in or to such service and facilities as shall be necessary or proper for the accommodation, convenience, and safety of its patrons, employes, and the public. . . ."

also to the attitude of the particular customer relative to participating in the cost of construction. See *Ridley Township v. Pennsylvania Public Utility Commission*, 172 Pa. Superior Ct. 472, 478, 94 A. 2d 168. Another consideration in this respect is the evidence in the record to the effect that Colonial could have increased its own fire protection service within its plant area with the existing supply of water by installing its own pump or possibly by increasing its secondary water supply.

Moreover, the commission found, on the basis of the evidence of record, that the water company has endeavored to furnish reasonably adequate service over the years to its customers, and that for several years immediately prior to this complaint proceeding the water company at its sole cost and expense expanded its distribution system by adding facilities for the extension or reinforcement thereof in keeping with the development and growth of the community.

We do not deem it improper, under the circumstances, for the commission to conclude that it would be an unreasonable and unjust burden upon the other customers of the water company if it were required to expend a very substantial sum of money to benefit primarily one customer.

At one point in its order the commission stated: "Were the Commission to order the additional facilities to be installed, such action would of necessity be predicated upon respondent receiving additional operating revenue commensurate with the capital outlay involved." Colonial asserts that this is not a correct statement of the law because the requirement that a utility make repairs or improvements to remedy an inadequate service does not depend upon the receipt of additional revenues. Generally this is true. The making of repairs and improvements to meet the duty

to render reasonable and adequate service is not necessarily dependent on the profit which may reasonably be expected therefrom; in proper cases such repairs and improvements may be ordered though the immediate result thereof would be a financial loss to the utility. See *Sherman v. Public Service Commission*, 90 Pa. Superior Ct. 523, 526; *Ridley Township v. Pennsylvania Public Utility Commission, supra*, 172 Pa. Superior Ct. 472, 478, 479, 94 A. 2d 168. In this proceeding, however, it does not appear that the commission dismissed the complaint of Colonial solely because of the fact that the repairs and improvements desired would not result in additional revenue. The order of the commission was founded upon its conclusion that existing service was adequate. Notwithstanding that fact, the commission gave consideration to the improvements requested; but it concluded—after recognizing (1) that the primary object of the complaint was to increase the service to only one customer in order that such customer might obtain optimum service, (2) that Colonial refused to participate in the cost of the improvements desired, and (3) that no increased revenues would be produced—that additional facilities would not be ordered at this time. We think the commission acted properly. A utility rendering reasonably adequate service should not be subjected to unreasonable expenditures, or the consuming public unduly burdened because of the unusual or extraordinary demands of one customer. See *Sherman v. Public Service Commission, supra*, 90 Pa. Superior Ct. 523, 526; *Ridley Township v. Pennsylvania Public Utility Commission, supra*, 172 Pa. Superior Ct. 472, 479, 94 A. 2d 168.

Colonial also contends that the order of the commission is insufficient in its findings of fact. This is similar to a contention made in *Warminster Township*

174

*Municipal Authority v. Pennsylvania Public Utility Commission,* 185 Pa. Superior Ct. 431, 441, 138 A. 2d 240, and is controlled by our observation in that case. We there stated (page 441 of 185 Pa. Superior Ct., page 245 of 138 A. 2d) : "The commission's order contains detailed statements of fact. Although the findings of the commission are not designated and numbered as such, they do amount to findings of fact rather than a mere recital of the testimony of witnesses. The essential requirement is that the commission's order be sufficiently specific to enable us to determine the controverted questions and whether proper weight was given to the evidence." The order of the commission was sufficiently specific for purposes of our review.

We find no reversible error in the commission's disposition of the complaint in this proceeding.

The order of the commission is affirmed.