**Paul KOSSMAN t/a Kossman
Development Company,
Petitioner,**

v.

**PENNSYLVANIA PUBLIC UTILITY
COMMISSION, Respondent.**

Commonwealth Court of Pennsylvania.

Argued March 13, 1997.

Decided May 19, 1997.

Ronald C. Backer, Pittsburgh, for petitioner.

Susan D. Colwell, Assistant Counsel, Harrisburg, for respondent.

Richard S. Herskovitz, Pittsburgh, for intervenor, Duquesne Light Company.

Before McGINLEY and FLAHERTY, JJ., and NARICK, Senior Judge.

FLAHERTY, Judge.

Paul Kossman (Kossman) petitions for review of an order from the Public Utility Commission (Commission) dismissing his exceptions and adopting the decision of the administrative law judge (ALJ) which concluded that Kossman is not entitled to a refund of the "contributions-in-aid-of-construction" (CIAC) that Duquesne Light Company (Duquesne) charged Kossman for service line extensions to his commercial developments and that Duquesne properly charged Kossman an "income tax gross-up," calculated pursuant to the relevant regulations promulgated by the Commission, Duquesne's Tariff, and the Public Utility Code (Code).[1] We affirm.

The parties have stipulated to the following facts. Kossman is a commercial real estate developer in Allegheny County. On May 13, 1994, Kossman filed a complaint before the Commission seeking a refund in the amount of $26,826.28 for CIAC payments that Duquesne required of Kossman prior to extending electrical service to four commercial developments built by Kossman between 1991 and 1994. All of these commercial developments are within Duquesne's electric service area and include the Penn Hills Municipal Shopping Center (Penn Hills), the Pittsburgh Plaza East Shopping Center (Pittsburgh Plaza), the Whitlock Auto Store (Whitlock), and the Taco Bell Restaurant (Taco Bell). Duquesne refunds CIAC payments for supply lines but not for service lines. Under Tariff Rule No. 8, Duquesne is permitted to charge reasonable installation fees in advance, including the income tax liability that accrues to Duquesne by the advancement of those fees, for service lines and equipment installed for the exclusive use of a customer which exceeds Duquesne's standards for free electric service installation.

On appeal, Kossman raises the following issues: (1) whether the Commission erred by concluding that the service line extensions to the four Kossman properties cannot, by definition, be the functional equivalent of a supply line for purposes of qualifying for a refund of CIAC payments; (2) whether the Commission erred in concluding that Duquesne's own policy of imposing nonrefundable CIAC charges upon service line extensions while imposing refundable CIAC charges for supply line extensions was not unreasonable, unlawful, or discriminatory; and (3) whether the Commission erred in concluding that Duquesne lawfully included "income tax gross-ups" for the CIAC charges imposed upon Kossman.[2]

I

Kossman argues that, although he was properly required to advance CIAC payments to Duquesne for service line extensions to the four commercial properties in the instant case, he should qualify for a refund of that money because there is no significant distinction between the service lines and a supply line under the respective definitions of those terms. In this regard, Kossman maintains that the ALJ's decision, which was adopted by the Commission, places form over substance by relying on the definitional difference between service lines and supply lines, rather than relying on the functional equivalence of the two, when it determined that CIAC for service lines are not refundable. We disagree.

Section 1501 of the Code, 66 Pa.C.S. § 1501, provides, in relevant part, the following:

1. 66 Pa.C.S. §§ 101–3312.

2. Our scope of review is limited to determining whether the Commission's findings of fact are supported by substantial evidence, an error of law has been committed, or constitutional rights have been violated. *City of Bethlehem v. Public Utility Commission*, 156 Pa.Cmwlth. 292, 627 A.2d 244 (1993).

Every public utility shall furnish and maintain adequate, efficient, safe, and reasonable service, and facilities, and shall make all such repairs, changes, alterations, substitutions, extensions, and improvements in or to such service and facilities as shall be necessary or proper for the accommodation, convenience, and safety of its patrons, employees, and the public.

*Id.* However, this section also provides that "every public utility may have reasonable rules and regulations governing the conditions under which it shall be required to render service." *Id.* Where one customer receives the benefit and convenience of a utility's improvements, that customer should be expected to contribute to the cost of those improvements. *Colonial Products Co. v. Public Utility Commission,* 188 Pa. Superior Ct. 163, 172–73, 146 A.2d 657, 663 (1958). Additionally, in *Lynch v. Public Utility Commission,* 140 Pa.Cmwlth. 599, 594 A.2d 816, 818 (1991), we stated that "[i]t is appropriate for customers to bear the cost of extensions when the extension is sought by a developer." *Id.* Therefore, although Duquesne generally has the burden of supplying and maintaining electrical service to its customers, it may develop rules that require developers to bear the burden of constructing facilities that extend service to their developments. Such a rule is at issue in the case *sub judice.*

The Commission's regulations define an electric supply line as "[t]he wires or cables, with the necessary supporting or containing structures and appurtenances, used in connection with an overhead or underground system of a public utility, providing electric power, located on a public highway or utility right-of-way and used to transmit or distribute electric energy." 52 Pa.Code § 57.1. This section of the administrative regulations further defines a service line in the following manner:

The wires or cables and appurtenances which connect the electric supply line of the public utility with the customer's installation and which comply with either of the following: (i) If overhead-open-wire or cable-construction, the span, normally 100 feet, extending to a suitable support provided by the customer. (ii) If the electric

supply line is of underground construction, the underground facilities extending to but not exceeding 18 inches inside the property line of the customer.

*Id.* Duquesne's Electric Service Installation Rules provide similar definitions for these terms. Kossman argues that, although the regulations distinguish between supply lines and service lines, as a practical matter, Kossman's service line extensions are the functional equivalent of a supply line, and the Commission erred in concluding that the inherent nature of service line extensions disqualified Kossman from a refund of CIAC.

In this regard, Kossman further argues that the only difference between the definition of a supply line and the definition of a service line is that a supply line is "located on a public highway or utility right-of-way." Consequently, argues Kossman, because Duquesne required Kossman to grant a utility right-of-way for the service line extensions to his properties, his service line extensions are equivalent to supply line extensions, and he qualifies for a refund of the CIAC payments that he advanced to Duquesne.

Whether a line extension exists on a utility right of way, however, is not the only definitional difference between a supply line and a service line. As noted above, a service line connects "the electric supply line of the public utility with the customer's installation." The regulations further define the term "customer's installation" as the "[w]iring and equipment on the premises of a customer, and poles, wires or cables and other facilities necessary to bring the terminus of the wiring of a customer to a location where it may be connected to the service line." 52 Pa.Code § 57.1. Because the term "customer's installation" is part of the definition of the term "service line" we must read these two definitions *in pari materia.*

■ As a result, the meaning of a service line becomes clear. A service line is that line extension that exists between a supply line and a customer's individual facilities which include all equipment and materials on the customer's individual premises that facilitate the receiving and consumption of electrical energy throughout the premises for all consumers of electrical energy on those premis-

es. Therefore, a supply line, by definition, never connects to buildings, structures, or facilities that use or otherwise consume electrical energy; only service lines perform such a function. This definitional distinction is significant because it justifies consistently treating service lines differently from supply lines with respect to refunding CIAC payments.

## II

Kossman argues that neither the Code, the regulations, nor Duquesne's Tariff disqualify service lines from a refund of CIAC payments. Kossman maintains that, although Duquesne's Tariff Rule No. 7 mandates CIAC payments for supply line extensions and also mandates that Duquesne refund those payments if certain conditions are met, the Tariff does not mandate the imposition of CIAC charges for service line extensions nor does the Tariff disqualify the service line customer from a refund of CIAC payments. Tariff Rule No. 8, which is applicable to service lines, states that Duquesne "reserves the right to make a reasonable charge including the related income tax, payable in advance, for service lines and for equipment installed for the exclusive use of a customer which exceed Company established standards described in the Company's 'Electric Service Installation Rules.'"[3] In other words, whether Duquesne chooses to impose CIAC charges or refund CIAC payments for a service line extension is wholly within its discretion which must be exercised reasonably.

■ A utility compiles its policies, rules, and regulations into its tariff, which it submits to the Commission for review. *Brockway Glass Co. v. Public Utility Commission,* 63 Pa.Cmwlth. 238, 437 A.2d 1067, 1070 (1981). Once approved, the tariff provisions are legally binding on both the utility and its

customers. *Id.* Therefore, Duquesne could treat a service line the same way as a supply line if circumstances justified such treatment. Kossman argues, however, that Duquesne does not exercise any discretion at all, as claimed in its Tariff. Rather it has instituted a policy to automatically impose a non-refundable CIAC charge for all service line extensions; a practice that was not approved by the Commission. This policy results in the unreasonable and discriminatory denial of refunds of CIAC payments for service line extensions that generate more revenue than the initial cost of installing the service line.

■ The burden of showing that a tariff is either unreasonable or discriminatory is on Kossman. This burden is very heavy because tariff provisions that have been properly submitted to and approved by the Commission are *prima facie* reasonable. *Shenango Township Board of Supervisors v. Public Utility Commission,* 686 A.2d 910, 914 (Pa.Cmwlth.1996). Kossman relies on a statement from *Erdos v. Western Pennsylvania Water Co.,* 63 Pa. P.U.C. 453 (1987), stating that a "policy which is uniformly applied, ignoring the facts and circumstances of a particular instance, may be unreasonably discriminatory by ignoring the peculiar facts and circumstances of a particular case." *Id.* at 459. From this premise, Kossman argues that the similarities between a supply line and the service lines in the instant case justify similar treatment for purposes of a refund and would be permitted by the Tariff, the Regulations, and the Code.

■ To the extent that the Commission's statement in *Erdos* may be a "binding norm," *Physician's Insurance Co. v. Callahan,* 167 Pa.Cmwlth. 485, 648 A.2d 608, 614 (1994), Kossman still had the burden of proving that Duquesne's policy to consistently refuse re-

---

**3.** Rule No. 2.31 of Duquesne's revised Electric Service Installation Rules provides that Duquesne "will extend an overhead service line (primary, secondary, or a combination thereof) for a customer on a single premise up to 100 feet to the point of connection designated by the Company at no cost to the customer." Rule No 2.31 further provides the following:

In the event the service line is greater than 100 feet in length, the customer:

a. Pays the total cost of the additional length of service line in excess of 100 feet on the customer's premises for his own service.... Where the Company elects to install facilities for the Company's purposes on the premise, that portion of the installation will not be considered in determining customer service line costs.

funds of CIAC payments for service line extensions was unreasonably discriminatory. Duquesne's policy of consistently denying refunds of CIAC payments to developers for service line construction is not amenable to a case-by-case application. The sole purpose of a service line is to provide electrical energy to private commercial, industrial, or residential facilities for consumption, regardless of the number of consumers on that property. Service lines can never be an integral part of Duquesne's system of mass distribution of electrical energy to customers-at-large. Contrary to Kossman's assertion, Duquesne's policy of not refunding CIAC payments for service line extensions is an exercise of discretion within the terms of its Tariff. This discretionary authority retained by Duquesne was approved by the Commission as a Tariff provision and is binding on the customers and Duquesne. Kossman has shown that the Tariff may be unfavorable to him, but he has not shown that the Tariff is unreasonable. After a review of the record, we must agree with the Commission that Kossman failed to meet his burden of proving that the Tariff provision, which permits Duquesne to exercise discretion in this area, was unreasonable or discriminatory.

■ Kossman argues by analogy that there is no difference between his service lines and the supply lines in a large residential development because both types of lines exist on a utility right-of-way and benefit large numbers of customers. Consequently, Kossman's commercial service lines provide a benefit to the community by providing job opportunities and services to the area. Therefore, argues Kossman, the fact that the service lines are on private property is not a significant difference. Kossman's hypothetical, however, is not analogous. The individual line extensions between the supply line and the individual residential consumers would be service lines and those service lines would be analogous to the service lines provided to Kossman's four commercially developed properties. In essence, the service lines extended to Kossman's properties are no different than service lines extended from a supply line to a large apartment building with, for example, two hundred units. Merely because many customers will receive elec-

tricity from the service line connection to the building, which will generate a large amount of revenue for Duquesne, does not change the inherent nature of the line extension from a service line to that of a supply line such that it justifies giving a refund and making the cost of the service line installation part of the rate base for all Duquesne customers. Further, the fact that each of the service lines exist on private property is not in itself significant, but the fact that each service line in the instant case *serves* only one private parcel is significant.

The reason that Duquesne gives a refund for a supply line that generates sufficient return is that the supply line is part of the mass distribution system of electricity for all Duquesne customers. (Tariff Rule No. 7). The cost of constructing the supply line then becomes part of the rate base for all Duquesne customers. In this manner, the increase in the rate base is in the nature of a tax. As a tax, all Duquesne customers pay for the benefit that they receive from the supply line as a result of directly or indirectly receiving electricity from that supply line. However, a service line, as previously mentioned, supplies an individual private parcel or development. Notwithstanding the number of tenants that exist on the private property or the revenue generated for Duquesne as a result of the service line extension to that property, a service line is not part of the "general supply system" of mass distribution of electricity such that all of Duquesne's customers should be required to pay, in their rate base, for one developer's project. In other words, the amount of revenue received by Duquesne from a service line that provides electrical service to a multitude of customers on a single lot of private property is not cause to require other customers in Duquesne's distribution territory to pay for that service line.

Additionally, the CIAC charges are part of Kossman's construction costs. Kossman can recoup these costs in the same manner that he recoups costs of construction materials, sewer lines, and plumbing, etc. The service line is part of Kossman's investment in his own property rather than his investment in the community. Therefore, we disagree with

Kossman's argument that the relevant inquiry should focus on the number of customers served by a service line and his argument that the private nature of his property is irrelevant. The number of Duquesne customers that are served by Kossman's service lines is irrelevant because that particular service line will not benefit customers-at-large within Duquesne's service territory such that those customers should be taxed for the construction of Kossman's service line. The relevant inquiry is whether the line extension connects a supply line to a private consumer facility not whether many customers are served by the service extension.

Kossman also relies on the standard pronounced in *Ridley Township v. Public Utility Commission*, 172 Pa. Superior Ct. 472, 94 A.2d 168 (1953), and argues that the focus should be on whether the cost of the extension will materially restrict the utility and whether there is a basis for making the cost of the extension part of the rate base. In *Ridley*, the township had expanded by almost 100% within a ten-year period. The township and property owners requested that a water utility extend a water supply line to a development within the township for residential water and fire hydrants. However, the utility refused to pay for the extension.

The Superior Court in *Ridley* stated the following:

> Ordinarily, it is not the business of the citizen or consumer to construct any part of a utility's system. There are, doubtless, instances where, under special circumstances, warranted by the evidence, the Commission may, in the exercise of its administrative discretion, withhold exercise of its power unless patrons offer to participate in the cost of construction.

*Id.* at 478–79, 94 A.2d at 171. The *Ridley* court held that the residents did not have to advance the cost of extending water service because the service area already contained "residents of suburban Philadelphia ... and of a community whose increase of population during the last decade denotes civic stability and presages continued healthy growth and expansion. Nothing in the record suggests 'over-development or premature development of scattered sections of' the Township 'in advance of its normal growth.'" *Id.* at 481, 94 A.2d at 172. Therefore, the speculative nature of development projects, which normally justifies charging customers in advance for the investment of a supply line, were not present, and the residents in *Ridley* that needed a source of water did not have to pay for an extension.

We agree with Commission that *Ridley* is not applicable to the instant case for two reasons. First, *Ridley* concerned a supply line extension to a residential district and not a service line to a parcel of private property for the consumption of water by the occupants of that property. Secondly, *Ridley* is also distinguishable because the public was not required to pay CIAC charges for a water supply line to a fully developed area where the rate of water consumption was not speculative. Therefore, no refund was involved. Even if we were to apply the *Ridley* standard in the case *sub judice*, we have already concluded that there is no basis for making the costs of Kossman's extensions part of the rate base.

■ We, therefore, hold that the Commission properly concluded that the service line extensions provided to Kossman's four commercial developments disqualified Kossman from obtaining a refund of CIAC payments. The Commission also properly concluded that Duquesne's policy of consistently treating supply lines and service lines differently for purposes of refunding CIAC payments was reasonable and non-discriminatory. Service line extensions are not the functional equivalent of supply line extensions and, therefore could never be part of the "general supply system" that benefits all Duquesne customers, as required by the Tariff for refunding CIAC payments for supply lines, and taxing all customers for Kossman's service lines would not be justified.

### III

Kossman also maintains that the procedure of adding the income tax that Duquesne will owe as a result of receiving the CIAC payments, called a "gross up," is discriminatory because it only impacts Duquesne's develop-

er customers. Duquesne is permitted to utilize a "gross-up" calculation while utilities in other areas are not so permitted. Therefore, argues Kossman, Duquesne has a competitive rate advantage over other utilities and developers within Duquesne's territory have a competitive disadvantage by having the burden of carrying extra costs of development.

As a result of the Tax Reform Act of 1986, public utilities became liable for the income tax that accrued to them for receiving CIAC payments. In *Re Contributions in Aid of Construction and Customer Advances*, 70 Pa. P.U.C. 44 (1989), several methods were advanced for making utilities whole by allowing them to recuperate the amount of their tax liability. In *Re Contributions*, the Commission approved the following two methods:

> CIAC Method 3—No gross-up of CIAC occurs. The utility pays the tax on the ... contribution and the resulting deferred tax debit is added to rate base. It is removed from the rate base as the utility receives the tax depreciation effects.

> CIAC Method 5—CIAC is "grossed-up" by the [net present value] NPV of the tax liability of CIAC, less the tax reductive effects of the tax depreciation that will be received over the plant's life.... There is no effect on current ratepayers' revenue requirement.

*Id.* at 47–48. Therefore, under method 3, all ratepayers within a utility's service territory pay for the income tax liability that accrues to the utility as a result of receiving payments in advance of construction while method 5 allows the utility to add their tax liability to the individual CIAC payments received, placing the burden for the tax on the individual developers who are responsible for the CIAC charges.

The Commission stated that the CIAC issue necessitates a uniform but flexible policy that "creates neither unreasonable rates nor financial burden, that assigns cost to those who will reap benefits and at the same time helps maintain an environment in the Commonwealth that is conducive to economic development and the growth of commerce." *Id.* at 57. The Commission permitted Duquesne and other utilities that were employ-

ing method 5, at time of the *Re Contributions* decision, to continue using that method while other utilities were directed to use method 3 and recuperate their tax liability by increasing the rate base of all customers.

Kossman argues that permitting Duquesne to use method 5 and add an income tax "gross-up" to the CIAC charge, unfairly places the full cost of the tax burden on developers which discourages economic growth in Duquesne's service area. Therefore, Kossman argues that Duquesne has an unfair competitive advantage over other utilities employing method 3 because Duquesne can offer a lower rate base to its customers while developers in Duquesne's service area have a competitive disadvantage. This disparate treatment, argues Kossman, is unreasonable and lacks the uniformity and consistency that the Commission determined was necessary. Permitting Duquesne to use method 5 merely because they were already using that method at the time of the Commission's decision in *Re Contributions* is an unreasonable justification for treating Duquesne, and the developers within Duquesne's service area, differently.

For the electric and gas industry, the Commission determined that method 3, which added income taxes to the rate base, "fulfills both requirements of promoting competition and economic growth. It requires only the base contribution or advance and shares the burden of taxes with current ratepayers who may also share in the 'public benefits' inherent in the increased economic growth." *Id.* at 57. The Commission recognized that the taxes associated with contributions from a large developer and user of energy are not reasonably assignable to other ratepayers except where an increase in jobs and economic development results from the CIAC charges. *Id.* at 56. However, the Commission sanctioned the use of method 5 for utilities already using that method and permitted other utilities to deviate from method 3 upon filing a petition with proposed tariff adjustments. *Id.* at 57.

Duquesne treats everyone within its service area equally. Clearly, the Commission, in *Re Contributions*, has permitted Duquesne to continue to use method number 5.

Therefore, the Commission correctly applied that decision to the instant case. Additionally, Duquesne's Tariff Rule No. 8, as previously mentioned, expressly states that Duquesne reserves the right to make reasonable charges for service lines *including related income taxes.* This Tariff provision has the force of law and is equally binding on the Duquesne and its customers. *Brockway Glass,* 437 A.2d at 1070.

▮ Kossman does not provide any legal support under Pennsylvania or federal law for his claim that developers in Duquesne's service area are unreasonably discriminated against by the Commission's decision in *Re Contributions.* The Commission has broad discretion and authority "in determining what expenses incurred by a utility may be charged to the ratepayers" as long as the expenses are not hypothetical. *Barasch v. Public Utility Commission,* 507 Pa. 561, 566, 493 A.2d 653, 655 (1985). The doctrine of primary jurisdiction " 'requires judicial abstention in cases where protection of the integrity of a regulatory scheme dictates preliminary resort to the agency which administers the scheme.' " *Weston v. Reading Co.,* 445 Pa. 182, 198–99, 282 A.2d 714, 723 (1971) (citation omitted). The doctrine of primary jurisdiction serves the following purposes: (1) the Commonwealth benefits from the agency's expertise and special experience in complex areas with which judges have little familiarity; (2) the statutory purpose and the intent of the legislature are fulfilled by honoring the powers granted to the agency by the legislature; and (3) the need to promote consistency in administrative policy is also fulfilled. *Elkin v. Bell Telephone Co.,* 491 Pa. 123, 132–33, 420 A.2d 371, 376 (1980). Therefore, where the Commission's decision concerns complex subject matter that is within its jurisdiction and expertise, the proper approach on review is to defer to the Commission and stay within our limited scope of review.

▮ In this regard, Kossman has failed to convince this court that the Commission's decision in *Re Contributions* is unsound. Conceivably, there are several reasons which may have affected the Commission's decision to grandfather certain utilities by allowing those already using method 5 to continue that practice, any one of which provides a rational basis for the Commission's decision to allow Duquesne to use method 5.

The burden on a utility to convert its accounting method to comply with method 3 was a stated concern of the Commission in *Re Contributions.* Also, Kossman fails to recognize that there is no guarantee that consumers of electricity will have the same rate for electrical service throughout the Commonwealth. Although Kossman argues that placing this added burden on developers inhibits economic growth, it is equally true that it encourages economic growth by maintaining low rates and thereby reducing the cost of doing business. As previously mentioned, Kossman could also pass this charge along to the purchasers or tenants of his commercial real estate developments. Also, there is no evidence in the record demonstrating that the Commission's decision to allow Duquesne to use method 5 while other utilities use method 3 fails to fulfill both requirements of promoting competition and economic growth.

Accordingly, the order of the Commission is affirmed.

### ORDER

AND NOW, this 19th day of May, 1997, the order of the Pennsylvania Public Utility Commission, dated July 24, 1996, at No. C–00945802, is hereby affirmed.